IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**FILED**

DEC 3 0 2004

TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

RICKY MELVIN HOLLEY,

      Petitioner,

v.                     Case No. 2:04-cv-00096

THOMAS MCBRIDE, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action for habeas corpus relief, filed pursuant to the provisions of 28 U.S.C. § 2254. Petitioner, Ricky Melvin Holley (hereinafter "Petitioner"), is incarcerated at the Mount Olive Correctional Complex, in Mount Olive, West Virginia. This case was referred to the undersigned United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings and a recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Pending is Respondent's Motion for Summary Judgment (docket sheet document # 8).

## PROCEDURAL HISTORY

On April 8, 1998, Petitioner was indicted by a Kanawha County Grand Jury on one count of murder in the first degree (Case No. 98-F-116)(# 9, Ex. 1). Following a jury trial conducted in May of 1999, Petitioner was found guilty of murder in the first degree, with no recommendation of mercy. (Id., Ex. 2). At trial,

Petitioner was represented by retained counsel, John Mitchell, Jr. and William Murray.

On August 30, 2000, Petitioner was sentenced by the Kanawha County Circuit Court (MacQueen, J.) to life without mercy. (# 9, Ex. 3). Petitioner's counsel filed post-trial motions for a new trial, judgment of acquittal and arrest of judgment, all of which were denied on October 24, 2000. (# 1, Ex. A).

On February 23, 2001, Petitioner, by counsel, Lonnie Simmons, filed a petition for appeal to the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting the following claims of error:

1. Whether the State's repeated comments in closing argument, labeling Defendant's trial counsel a "liar," stating that Defendant had lied, and "reenacting" the crime by striking eleven times the shelf in front of the jury with a hatchet was so egregious and prejudicial that the substantial rights of the Defendant were affected or the truth-finding process was substantially impaired, requiring the reversal of the conviction and remand for a new trial?

2. Whether the trial court erred in admitting hearsay testimony from numerous witnesses regarding the victim's alleged fear of Defendant where such evidence was not relevant to any fact in issue?

3. Whether the trial court erred in allowing a potential juror to remain on the panel, where she had been the victim of a domestic violence charge involving her husband, who was prosecuted by one of the assistant prosecutors in this case, and where she had answered in response to the jury questionnaire that she had formed an opinion already about Defendant's guilt?

4. Whether the trial court erred in denying Defendant's motion for judgment of acquittal and motion to set aside the conviction based upon the

2

insufficiency of the evidence?

(# 1, Ex. B at 28).  The petition for appeal was summarily refused on May 9, 2001.  (Id., Ex. C).  On June 26, 2001, Petitioner, by counsel, moved the SCAWV for leave to file a "Renewed Petition for Appeal" (id., Ex. D), which was refused on July 6, 2001.  (Id., Ex. E).

Petitioner did not file a petition for a writ of certiorari in the Supreme Court of the United States.  Thus, his judgment became final on or about October 3, 2001.  See Harris v. Hutchinson, 209 F.3d 325, 328 (4th Cir. 2000)(time for seeking direct review concludes when either the period for filing a petition for a writ of certiorari is filed or when such writ is denied by the Supreme Court).  The one-year period in which to file a Federal petition for a writ of habeas corpus began to run on that date.

On April 23, 2002, Petitioner, by counsel, James B. Lees, Jr., filed a petition for a writ of habeas corpus in the Circuit Court of Kanawha County (Case No. 02-MISC-158). (# 1, Ex. F).  Thus, the one-year statute of limitations was tolled at that point.  The State habeas petition raised the following claims:

1.   Ineffective assistance of counsel:

     A.   Counsel failed to move for mistrials or cautionary instructions

     B.   Defense counsel failed to effectively conduct voir dire

     C.   Defense counsel failed to properly object to improper character evidence

3

    D.   Failure to adequately investigate

    E.   Other evidence of ineffectiveness

       ►   failure to object to improper charge

       ►   failure to offer instruction concerning convicted child molester

2.   Constitutional error and evidentiary rulings

    A.   Prosecutorial misconduct

    B.   The trial court improperly refused an objection to a juror

    C.   Improper character and hearsay testimony was admitted at trial

    D.   Failure to provide an appeal as a matter of right

3.   Improper jury instructions

4.   Improper jurisdiction and venue

5.   Defendant's absence from part of the proceeding

6.   Refusal to turn over witness notes after witness testified

7.   Sufficiency of evidence

(<u>Id.</u>)

The Circuit Court of Kanawha County (Bloom, J.) conducted an omnibus habeas corpus hearing on October 4, 2002, during which the court addressed each ground for relief raised by Petitioner, and which could have been asserted pursuant to <u>Losh v. McKenzie</u>, 277 S.E.2d 606 (W. Va. 1981)(<u>Id.</u>, Ex. G). By order entered February 6, 2003, the Circuit Court made detailed findings of fact and conclusions of law addressing each ground raised by Petitioner, and

denied the petition on the merits.   The court also found that Petitioner had knowingly and intelligently waived any other grounds for relief.  (Id., Ex. H).

On June 3, 2003, Petitioner, by counsel, Mr. Lees, appealed the denial of his State court habeas petition to the SCAWV, assigning the following errors:

1.   The Circuit Court erred in concluding Petitioner failed to prove ineffective assistance of counsel

   a.   Attorney Mitchell's failure to use/introduce evidence inconsistent with guilt.

   b.   Attorney Mitchell's failure to timely object and/or move for mistrials in the face of prosecutorial misconduct.

   c.   Other evidence of ineffective assistance of counsel.

2.   The Circuit Court erred in concluding the State did not engage in prosecutorial misconduct rising to the level of a constitutional violation.

3.   The Circuit Court erred in concluding the admission of hearsay and character evidence did not violate Petitioner's constitutional right to due process of law.

4.   The Circuit Court erred in concluding the seating of one juror did not violate Petitioner's constitutional right to due process of law.

5.   The Circuit Court erred in concluding that evidence presented at trial was sufficient to sustain a conviction of murder in the first degree.

6.   The Circuit Court erred in concluding that Petitioner was deprived of an appeal from his conviction as a matter of right.

7.   The Circuit Court erred in concluding jurisdiction and venue was proper at the trial of this matter,

5

that the jury instructions of the trial court were proper, and that the Petitioner's absence from a part of the underlying proceedings did not violate the Petitioner's constitutional right to due process of law.[1]

(Id., Ex. I). The SCAWV refused the petition for appeal of the denial Petitioner's State court habeas petition on January 27, 2004. (Id., Ex. J).

On February 5, 2004, Petitioner, by counsel, Mr. Lees, filed the present petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, asserting the following grounds for relief:

1.  Petitioner was denied the effective assistance of counsel pursuant to the Sixth Amendment to the United States Constitution.

2.  Petitioner was denied due process of law guaranteed by the Fourteenth Amendment to the United States Constitution based upon prosecutorial misconduct and evidentiary rulings.

3.  Petitioner was denied one State court appeal as a matter of right as guaranteed by the Fourteenth Amendment to the United States Constitution.

(# 1 at 9). Attached to Petitioner's federal petition are numerous exhibits, which include his prior State court petitions for appeal and for a writ of habeas corpus, and the orders denying or refusing those petitions, as well as the transcript from his omnibus habeas corpus hearing in the Circuit Court of Kanawha County.

---

[1] The issues raised in Ground 7 of Petitioner's habeas appeal were not raised in his direct appeal to the SCAWV. These issues were, however, raised in Petitioner's Kanawha County habeas petition.

On February 17, 2004, the undersigned ordered Respondent to file a response to the federal petition on or before March 31, 2004. (# 3). On April 6, 2004, Petitioner filed an "Addendum" to his federal petition, in which he sought to add a claim concerning the denial of his Sixth Amendment Confrontation Clause rights, as a result of the admission at trial of certain statements made by his deceased wife to the effect that she was afraid of Petitioner. (# 7).

After receiving an extension of time to file his response, on April 28, 2004, Respondent filed a Consolidated Answer, Motion for Summary Judgment, and Memorandum in Support Thereof. (# 8). Respondent also submitted two volumes of exhibits, which include copies of the indictment and pretrial motions in Petitioner's criminal matter, as well as the trial transcript, which is over 2,000 pages in length. (## 9 and 10, Ex. 11).

On June 1, 2004, Petitioner filed a Response to Respondent's Consolidated Answer and Motion for Summary Judgment. (# 13). Respondent did not file a Reply. The matter is now ripe for determination.

## EXHAUSTION OF STATE REMEDIES

Respondent's motion asserts that Petitioner has not exhausted his State court remedies concerning the Confrontation Clause claim he has raised in the Addendum to his petition. However, Respondent has waived any exhaustion argument, and requests that this Federal

court rule on the merits of each of Petitioner's claims.  (# 8 at

53 n.36).  "An application for a writ of habeas corpus may be

denied on the merits, notwithstanding the failure of the applicant

to exhaust the remedies available in the courts of the State."  28

U.S.C. § 2254(b)(2).

### STANDARD OF REVIEW

Title 28, United States Code, Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of
a person in custody pursuant to the judgment of a State
court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings
unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal Law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Here, Petitioner claims that the State

courts' decisions denying his claims for habeas corpus relief

implicate both 28 U.S.C. §§ 2254(d)(1) and (d)(2).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the United

States Supreme Court held that under the "contrary to" clause, a

Federal habeas court may grant a writ of habeas corpus with respect

to claims adjudicated on the merits in State court only if (1) the

State court arrives at a conclusion opposite to that reached by the

Supreme Court on a question of law, or (2) if the State court

decides a case differently from the Supreme Court on a set of

materially indistinguishable facts.  The Court went on to note that under the "unreasonable application" test, a Federal habeas court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in State court only if the State court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

The Circuit Court of Kanawha County denied Petitioner's petition for a writ of habeas corpus on the merits, following an evidentiary hearing.  (# 1, Ex. H).  The SCAWV then summarily refused Petitioner's appeal of the denial of his habeas petition. (Id., Ex. J).

The United States Court of Appeals for the Fourth Circuit has consistently held that "a summary state court decision on the merits of a federal constitutional claim is an 'adjudication' of the claim for purposes of § 2254(d)."  Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000)(en banc).  Beginning with Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998), and continuing with Weeks v. Angelone, 176 F.3d 249, 257 (4th Cir. 1999), aff'd, 528 U.S. 225 (2000), Baker v. Corcoran, 220 F.3d 276, 291 n.14 (4th Cir. 2000), Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000), and concluding with Bell v. Jarvis, the Fourth Circuit has ruled, in a variety of procedural contexts, that Federal courts are limited to a deferential review of the result of State court decisions.

9

The holding was stated most explicitly in Bell, an en banc decision which overruled Cardwell v. Greene, 152 F.3d 331 (4th Cir. 1998):

> We have consistently held that a summary state court decision on the merits of a federal constitutional claim is an "adjudication" of the claim for purposes of § 2254(d), and we reaffirm that holding today. See Bacon, 225 F.3d at 478; Baker, 220 F.3d at 291 n.14. Wright, 151 F.3d at 156-57; Cardwell, 152 F.3d at 339. When the state court fails to articulate the rationale behind its ruling, we must independently review the record and the applicable law. See Bacon, 225 F.3d at 478; Baker, 220 F.3d at 291 n.14. However, this independent review of the record and applicable law must be distinguished from a de novo review of the petitioner's claims and from a requirement that we make an independent determination on the merits of those claims. See, e.g., Aycox, 196 F.3d at 1178. It does not render the difference between de novo review and reasonableness review insignificant or equate to a requirement that the federal court independently ascertain whether, in its judgment, there has been a violation of the petitioner's constitutional rights prior to determining whether the state court's decision was reasonable. Rather,
>
>> we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented.... Our review is in fact deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable.
>
> Id. (emphasis added); see also Harris, 212 F.3d at 943 n.1 ("Where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standard articulated" by the AEDPA [Antiterrorism and Effective Death Penalty Act])(emphasis added).

Bell, 236 F.3d at 163.

Based upon <u>Bell</u>, the undersigned proposes that the presiding District Judge **FIND** that the State courts' decisions on Petitioner's habeas corpus claims were an adjudication on the merits for purposes of § 2254(d). The SCAWV did not articulate the rationale behind its ruling refusing Petitioner's habeas corpus claims. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the appropriate standard of review is an independent, but deferential, review of the record and the applicable law to determine whether the State courts' decisions (i.e. the "results") were legally or factually unreasonable.

## FACTUAL BACKGROUND AND TRIAL TESTIMONY

### A.  Petitioner and Leigh Ann's relationship

On February 14, 1985, Petitioner married Leigh Ann Hill. (# 9, Ex. 11 at 594-595). Petitioner, Leigh Ann and their two minor children, Matthew and Rachel, lived in a house on Smiley Drive on Spring Hill Mountain in South Charleston, West Virginia. Petitioner's parents lived in a house on Margy Lane, the next street over; however, Petitioner's yard adjoined his parents' yard. (<u>Id.</u> at 594-595).

A substantial portion of the State's evidence at trial sought to demonstrate that Petitioner and Leigh Ann had a troubled relationship. One of the State's witnesses was Leigh Ann's mother, Karen Noffsinger. Ms. Noffsinger testified that, in the fall of 1996, she learned that Leigh Ann was filing for divorce. On

11

October 31, 1996, Ms. Noffsinger assisted her daughter in renting an apartment in Cross Lanes, West Virginia. (Id. at 603). That same day, Leigh Ann separated from Petitioner and moved into the apartment with the two children. Petitioner remained in the marital home. (Id. at 526-527, 603-604). Ms. Noffsinger admitted that she did not like Petitioner. (Id. at 643).

Ms. Noffsinger also testified concerning an incident that occurred in January of 1997, when she and her fiancee witnessed Petitioner and his father block Leigh Ann's car in between their cars as they were driving down the road. Ms. Noffsinger stated that she began to honk her horn and take pictures of the scene. Eventually, Leigh Ann was able to pull over. At that point, Petitioner and his father took off in their cars. Although no contact was made among the vehicles, Ms. Noffsinger testified that Leigh Ann was scared by the incident. (Id. at 613-617). Lisa Wiles, a friend of Leigh Ann's, was in the car with Leigh Ann and corroborated most of Ms. Noffsinger's testimony (# 10, Ex. 11 at 1087-1090), as did Ms. Noffsinger's fiancee, James Valleau. (Id. at 1110-1113).

Ms. Noffsinger also testified about a photograph taken of Leigh Ann in the fall of 1995 in which Leigh Ann allegedly had a black eye. (# 9, Ex. 11 at 609-610). Ms. Noffsinger further testified about a trip to Florida on which Petitioner had taken Leigh Ann and the children prior to their separation. (Id. at 598-

12

602).  Ms. Noffsinger stated that Leigh Ann was surprised by the trip and did not want to go.  (Id. at 601-602).  Ms. Noffsinger further testified that, upon returning from the trip, Leigh Ann had a bruise on her thigh.  (Id. at 611).  No evidence was presented, however, concerning the cause of either of these alleged injuries.

Additional State witnesses testified that Leigh Ann had expressed a fear of Petitioner on numerous occasions.  (# 9, Ex. 11 at 605-606; # 10, Ex. 11 at 1058, 1092, 1168, 1189, 1196, 1339). Prior to the admission of this testimony, the trial court held a suppression hearing and ruled that this testimony would be admissible only on the issue of whether Leigh Ann voluntarily went to Petitioner's home on the night in question.  (# 9, Ex. 9).

At trial, the court read the jury a cautionary instruction on this issue, stating:

> [a]ny evidence you may hear tendered on behalf of the Prosecuting Attorney relating to the victim, Leigh Ann Holley, of being in fear of the defendant, Ricky Melvin Holley, is to be considered by you not as evidence that the defendant Ricky Melvin Holley [] is guilty of killing the victim, Leigh Ann Holley; but rather, is to be considered by you only as to the reasonableness of any assertions which may be made that the victim, Leigh Ann Holley, may have *voluntarily* gone alone to the residence of the defendant, Ricky Melvin Holley, on April 3, 1997.

(# 9, Ex. 11 at 605-606).

Leona Robinson, who lived in the same apartment building as Leigh Ann, testified that, on February 13, 1997, around midnight, she saw a man meeting Petitioner's description standing outside of her apartment.  (# 10, Ex. 11 at 1172).  The next day, Ms. Robinson

13

saw the same man playing basketball with Matthew and Rachel Holley. Leigh Ann informed Ms. Robinson that the man was her husband. (Id. at 1175). That day, which happened to be Petitioner and Leigh Ann's wedding anniversary, Ms. Robinson observed that all four of the tires on Leigh Ann's car were flat. (Id. at 1177).

Ms. Robinson further testified that, on several occasions, she witnessed Petitioner sitting in his vehicle with the engine running in the parking lot of the apartment complex for fifteen minutes to a half hour after he had dropped the children off at Leigh Ann's apartment. (Id. at 1179-1180). Another friend of Leigh Ann's, Tamara Searls, testified that she had once received a call from Leigh Ann who stated that Petitioner was sitting in his car outside her apartment for a couple of hours. (Id. at 1057).

Lisa Wiles testified about an incident that occurred on November 30, 1996, when Petitioner had failed to timely return the children to Leigh Ann during one of his visitation periods. (Id. at 1080). Ms. Wiles accompanied Leigh Ann to Petitioner's parents' house to see if the children were there. After knocking on the door and receiving no answer, Leigh Ann returned to her car and then backed up into Petitioner's driveway. (Id. at 1083). Ms. Wiles then saw Petitioner running toward Leigh Ann from his parents' house. Petitioner fell before he reached her. (Id. at 1084) An argument ensued, and Ms. Wiles stated that it appeared that Petitioner was about to strike Leigh Ann when he realized that

14

Ms. Wiles was there.  (<u>Id.</u> at 1085).

In January of 1996, Ms. Wiles also accompanied Leigh Ann to one of her divorce hearings.  Later that day, Ms. Wiles received a telephone call from Petitioner, who asked where Leigh Ann was, and stated that "she was probably with her boyfriend."  Petitioner also asked Ms. Wiles why she was at the hearing and threatened to "take [her] down, too" if she helped Leigh Ann.  (<u>Id.</u> at 1095-1097). Kathy Lawson, Leigh Ann's hairdresser, testified that Leigh Ann had told her that Petitioner had jumped up and down on the hood of her car, causing damage to the hood.  (<u>Id.</u> at 1190).

**B.   <u>Leigh Ann's relationship with Perry Johnson</u>**

Around the time of her separation from Petitioner, Leigh Ann began an intimate relationship with a gentleman named Parris "Perry" Johnson.  (<u>Id.</u>, at 1414).  Perry Johnson was on probation after a period of incarceration for sexual abuse of a minor.  (<u>Id.</u> at 1372).  As a result of his probation, and the fact that Leigh Ann did not want to expose her children to the fact that she was seeing someone new, Mr. Johnson testified that he and Leigh Ann only got together on occasions when the children were not present. Normally, that was on the weekends, when the children would go to stay with their father.  (<u>Id.</u> at 1336).  Mr. Johnson also testified that he gave Leigh Ann two rings during their relationship; one of the rings spelled the word "Love."  (<u>Id.</u> at 1343).  Various witnesses testified that Leigh Ann had lost a considerable amount

of weight after separating from Petitioner, that she was getting ready to start a new job, and that she seemed to be very happy. (# 9, Ex. 11 at 540, 617-621, 623-624; # 10, Ex. 11 at 1069, 1337).

### C.   The events surround Leigh Ann's disappearance

On or about April 3, 1997, Leigh Ann disappeared. Hazel Massey placed Leigh Ann at the Spring Hill Little League ballpark between 3:00 p.m. and 5:30 p.m. that day. (# 9, Ex. 11 at 539-540). The testimony of other witnesses, and the caller ID box on Leigh Ann's telephone, indicate that she participated in several telephone calls at her apartment between 8:00 p.m. and approximately 9:30 p.m. (Id. at 622, 716; # 10, Ex. 11 at 1095). Gwen Farley testified that she called Leigh Ann around 8:00 p.m., but got off the phone quickly because Leigh Ann sounded as though she were busy with the children. (# 9, Ex. 11 at 536). The caller ID indicated that this telephone call was made at 9:29 p.m. (Id. at 716).

Ms. Noffsinger testified that, sometime after 8:00, she spoke with Leigh Ann by telephone. (Id. at 621). Ms. Noffsinger stated that Leigh Ann was getting the children ready to go to stay with Petitioner for the night. (Id. at 622).

Lisa Wiles testified that, at about 9:35 p.m., she called Leigh Ann and had a short conversation. (# 10, Ex. 11 at 1092). Ms. Wiles believed that Leigh Ann was giving a child a bath and was getting their things ready for them to take to Petitioner's house

16

for the weekend.   While on the phone with Lisa Wiles, Leigh Ann received a phone call from Petitioner.   (<u>Id.</u> at 1093-1095).

Petitioner's mother, Jean Holley, testified that Matthew and Rachel called her earlier that evening, looking for their father. She further stated that Petitioner then called to ask her if she could watch the children until he came home from work.   (<u>Id.</u>, at 1858-1860).  Mrs. Holley further testified that Leigh Ann dropped off the children at her home on Margy Lane around 10:00 p.m.  (<u>Id.</u> at 1860).  The children stayed at her house until Petitioner came to pick them up.  (<u>Id.</u> at 1861).  On cross-examination, however, Mrs. Holley testified that she went to bed shortly after the children arrived, so she does not know for certain who picked them up or at what time.  (<u>Id.</u> at 1869). According to Petitioner's brother, Chris, Petitioner left the West Virginia Paving garage shortly before 11:00 p.m.  (<u>Id.</u> at 1925).

On April 4, 1997, Leigh Ann's blue Chevrolet Cavalier, with the license plate "Leigh A." was seen parked outside of Petitioner's house, but Leigh Ann was nowhere to be found.   A neighbor, Brenda Kay Davidson, testified that she did not hear any cars go up Petitioner's driveway prior to 11:20 that night.   The neighbor stated that she would have heard Leigh Ann's car because it had a noisy muffler.  (<u>Id.</u> at 1012-1023).

Kanawha County Deputy Sheriff Jeffrey Dale Meadows testified that, around 7:00 p.m. on April 4, 1997, he received a missing

17

persons report regarding Leigh Ann Holley, which was filed by her mother. (# 9, Ex. 11 at 525-526). Ms. Noffsinger told Deputy Meadows that the last time she had spoken with Leigh Ann was at 9:00 p.m. on April 3, 1997. (Id. at 526). Ms. Noffsinger testified that she went to Leigh Ann's apartment on April 4, 1997, and stated that she found it to be unusually messy and that it appeared that Leigh Ann and the children had eaten a meal the previous day that included green beans and onions. (Id. at 636-637). At approximately 9:00 p.m. on April 4, 1997, Deputy Meadows went to Petitioner's house and discovered Leigh Ann's car in his driveway. (Id. at 531).

On April 5, 1997, Deputy Detective Raymond J. Flint met with Deputy Meadows and Ms. Noffsinger at Leigh Ann's apartment. (Id. at 713). As Detective Flint examined the apartment, he noted the calls registered on Leigh Ann's caller ID box. (Id. at 715). The caller ID box revealed that Leigh Ann had received calls from David (Gwen) Farley at 9:29 p.m., West Virginia Paving at 9:35 p.m., L. Wiles at 9:35 p.m. and Perry Johnson at 11:38 p.m. (Id. at 716).

Following Leigh Ann's disappearance, Petitioner was questioned on several occasions by local police officers, State Troopers and investigators for the FBI. On April 5, 1997, Trooper Christopher Zerkle and Trooper M.L. Bailey went to the Clay County farm owned by Petitioner's parents, where Petitioner had taken the children for the weekend. (Id. at 559). When the officers arrived at the

18

farm, it was dark. Trooper Zerkle saw two males approach his vehicle. Using his headlights and a flashlight, Trooper Zerkle was able to identify the two men as Petitioner and his father. (Id. 561).

Petitioner told Trooper Zerkle that he did not know where Leigh Ann was, that he did not know that her car was in his driveway, or how it had gotten there, and that he did not know the last time that he had seen her. (Id. at 563). Trooper Zerkle testified that Petitioner's demeanor was calm. (Id. at 573).

Trooper Zerkle testified that, as he looked around Petitioner's red Blazer, using a flashlight, he noticed that there was a trailer parked directly behind it that did not have lights or proper registration. Trooper Zerkle also noted a "black sort of like tool box that would fit on the back of a trailer, or in the back of a truck. [He] believe[d] it had a red stripe around it." (Id. at 567-568).[2] Trooper Bailey did not recall seeing a tool box at the farm. (Id. at 572).

On April 6, 1997, Detective Flint went to Petitioner's parents' home on Margy Lane and spoke to Petitioner. (Id. at 720). Initially, Petitioner did not want to speak to Detective Flint

---

[2] Approximately one month later, when Trooper Zerkle saw the news report concerning the recovery of a black tool box with a body in it, he remembered seeing a similar tool box at the Holley's farm. (Id. at 571). Trooper Zerkle testified that he thought the recovered tool box was similar to the one he had seen, but he could not say for certain that it was. (Id. at 583).

19

without consulting his divorce attorney because "he didn't want to get into something that was going to affect his divorce, something that could be used against him." (Id. at 722). Once Detective Flint assured Petitioner that his questions did not concern the divorce proceedings, Petitioner agreed to speak to him. (Id.)

According to Detective Flint, Petitioner did not seem nervous. (Id. at 789). He testified that Petitioner told him that, on April 3, 1997, he had been at the garage at West Virginia Paving working on his brother's race car and came home to look for brake linings around 10:00 p.m. (Id. at 723). Detective Flint then gave this summary of Petitioner's statement:

> When he got to the area, he observed his wife in the area of the forks of Margy. Margy has two little forks coming off of Chestnut going up into it. He pulled up there and started talking to her, and she told him that she left the kids at his mom's, and then she brought up the business about wanting to know if they were going fishing that weekend, because she had only brought the kids one change of clothes, and if necessary she would bring more and leave them at his niece's, Summer Edwards. Then he said the conversation came around that she wanted some clothes, I believe it was jeans, and he told her No, you are not getting them.

> Q. Did he characterize this conversation at the forks of Chestnut and Margy as an argument or as a discussion?

> A. A discussion.

> * * *

> A. He told her no, she wasn't going to get them until the Court decided. He left and went on to his residence to get this part for the race car.

20

Q.   Did he say how he went up to his residence?

A.   He said as he was backing up his driveway to his residence here comes Leigh Ann. He said he backed on up, and she got out of the car, and she brought up about clothes again, and he told her no. He went along the way about his business looking for the brake lining, and when he come out she was still standing there, so he just went ahead and left.

Q.   Left her standing there?

A.   Yes, sir.

Q.   Did he say where he went after he left her standing there?

A.    Back to the garage.

Q.    Back to the garage?

A.   Back to the West Virginia Paving to his race car.

Q.   Did he tell you at some point that night he came back home?

A.   Yes, sir.

Q.   Did he say anything about his kids?

A.   He came back and picked his kids up from his mother and father and brought them to his house, at which time they observed Leigh Ann's car sitting there in the driveway.

Q.   But he didn't see her?

A.   No.

Q.   What did he say happened next?

A.   He said he looked around for her, and him and the kids looked around for her and didn't see her and went to bed.

(Id. at 723-726). Trooper Bailey testified that the children told

21

him that the last time they had seen their mother was when she dropped them off at their grandparents' house.  (Id. at 545).

According to Trooper Zerkle, Petitioner further stated that, around 7:00 a.m. on April 4, 1997, he had taken the children to stay with his niece, while he went to work, and later that day, he picked the children up, went to buy some fishing equipment and drove to the farm in Clay County for the weekend.  (Id. at 726-727).

On April 6, 1997, Ms. Noffsinger was in Leigh Ann's apartment when Petitioner arrived to return the children to Leigh Ann, pursuant to the visitation schedule. (Id. at 629-630).  Rachel came up to the apartment alone and Ms. Noffsinger told her that Leigh Ann was in the bathroom.  Rachel returned to the car and then she, Matthew, Petitioner and Jean Holley came up together.  (Id. at 631).  When it became clear that Leigh Ann was not in the apartment, Petitioner and Jean took the children and left. (Id. at 632).

On April 10, 1997, Detective Flint was involved in a consensual search of Petitioner's property.  Petitioner showed Detective Flint around the property and was cooperative with the search.  (Id. at 729, 731, 807).  Although no relevant physical evidence was found, Detective Flint noticed a circular area where something had been burned.  Petitioner told Detective Flint that he had been burning some of Leigh Ann's clothing.  (Id. at 731-733).

22

On April 22, 1997, Detective Flint and other officers searched Petitioner's property again, using a specially trained dog. Again, no relevant evidence was recovered. (Id. at 807).

On April 23, 1997, Ms. Noffsinger and a friend were in Leigh Ann's apartment, when Ms. Noffsinger discovered Leigh Ann's purse on a shelf in a closet. Ms. Noffsinger turned the purse over to the police and told Detective Flint that she had looked in that closet before and had not seen the purse. (Id. at 640-641, 670-671).

Ms. Noffsinger also told Detective Flint that she believed other items in the apartment had been moved, and that a piece of masking tape that she had placed on the edge of the door to detect if the door had been opened was missing. (Id. at 673, 704). Detective Flint confirmed that, in his searches of Leigh Ann's apartment, he had not moved anything around and he had not seen the purse. (Id. at 784). At the time of her disappearance, only Leigh Ann's mother and Mr. Johnson had extra keys to Leigh Ann's apartment. (Id. at 658-659).

### D.   The discovery of Leigh Ann's body

On May 12, 1997, Leigh Ann's body, inside a black plastic tool box that was floating in the Kanawha River, was discovered by fishermen near St. Albans, West Virginia. (Id. at 549-555). Several other witnesses testified that they had seen a black tool box floating in the river within two or three weeks of the

23

discovery of the body.  (# 10, Ex, 11 at 1258-1259, 1301-1303).

Dr. Irvin Sopher, then Chief Medical Examiner for the State of West Virginia, came to the scene where the tool box was recovered. Detective Flint was also present for the examination of the body at the scene.  (# 9, Ex. 11 at 741-742).

At trial, Dr. Sopher testified that, upon his arrival, the tool box was unlocked, the lid was open and the left front latch was missing.  (# 10, Ex. 11 at 1597).  The decomposed female body inside the box was wearing only a pair of blue pants and had a blue dog leash placed loosely around the neck.  She also had a ring that spelled "Love" on her left ring finger, which was broken.  (Id. at 1548).  Dr. Sopher determined that the body was that of Leigh Ann Holley based upon dental records.  (Id. at 1587-88).

Dr. Sopher testified that, during the autopsy, he discovered three lacerations on the back of Leigh Ann's head, which were most likely caused by a tubular object such as a pipe or bat.  (Id. at 1561).  He opined that Leigh Ann was alive when these wounds were inflicted, and that those wounds were the cause of her death.  (Id. at 1566-1567).  Additionally, Dr. Sopher stated that he discovered nine to ten injuries to Leigh Ann's neck, which were caused by a sharp object, such as an axe or a meat cleaver, and which were post-mortem in nature.  (Id. at 1573, 1577-1579).  As a result of those injuries, Leigh Ann was nearly decapitated.  (Id.)

24

Dr. Sopher discovered a half pint of string beans and a few slivers of onions still in Leigh Ann's stomach, which he stated likely revealed that she was killed within three to five hours of her last meal. (<u>Id.</u> at 1591).

**E.   The tool box evidence**

On May 22, 1997, law enforcement officials conducted another search of Petitioner's property and vehicles. Again, no evidence of blood stains or a murder weapon were located. The police, however, gathered numerous pieces of physical evidence. Samples obtained from the tool box and from Petitioner's house and vehicle were negative for any trace evidence of Leigh Ann Holley or the tool box. (# 9, Ex. 11 at 820). Five latent fingerprints were found on items in Leigh Ann's purse, but none of them belonged to Petitioner. (<u>Id.</u> at 822). Detective Flint testified as follows:

> Q.   So the long and the short of it is, you found no evidence of hairs or anything or paint scrapings or textile fibers from the search that matched up with the hairs in the textile fibers and blood samples that came from the victim or the box; correct?

> A.   Right.

(<u>Id.</u> at 829).

During the May 22, 1997 search, however, police discovered a small tool box key with "K-128" stamped on it. The key was located on a key ring that was lying on the passenger seat of Petitioner's Blazer, to which Petitioner had directed Detective Flint. (<u>Id.</u> at 751, 753, 800-01). The tool box in which Leigh Ann's body had been

25

placed had a lock that also had a "K-128" stamped on it. (Id. at 754). It was subsequently determined that the key that was found opened the lock on the tool box. (Id. at 756). Petitioner was arrested for Leigh Ann's murder on May 28, 1997.

The FBI could not ultimately conclude that the recovered key was the specific key that had made the marks inside the locking mechanism on the recovered tool box. (Id. at 825). Furthermore, at trial, Petitioner's counsel put on evidence concerning the fact that only 40 lock combinations had been designed for the type of tool box that was recovered, and that between 250,000 and 300,000 tool boxes had been manufactured using those lock combinations. Thus, it was determined that the key located on Petitioner's key ring could open more than one tool box and, consequently, there could have been more than one key that would open the recovered tool box. (Id. at 833-837; # 10, Ex. 11 at 1933-35).

The State was unable to prove by direct evidence that the tool box in which Leigh Ann Holley's body was recovered was owned by Petitioner or his family. Several friends and family members testified on behalf of Petitioner that they had never seen any member of the Holley family in possession of a black plastic tool box similar to the one in which Leigh Ann's body was found. (# 10, Ex. 11 at 1043, 1321, 1617-1619, 1680-81, 1724-25, 1770, 1797-98, 1825-26, 1893, 1901, 1908-09). The undersigned will further discuss the testimony of these witnesses when addressing the

26

Petitioner's case in chief. The State, on the other hand, produced at least three witnesses who stated that they had seen a similar toolbox in the possession of either Petitioner or his brother Chris at some time in the past. (Id. at 1269, 1284-85, 1491-92, 1494).

### F. The State's other circumstantial evidence

At trial, the State developed other circumstantial evidence to support Petitioner's guilt. Trooper John R. Giacalone, an expert in forensic chemistry, testified that he examined some black smears in the molding of Petitioner's Blazer and compared them with the chemical composition of the plastic used in the tool box. Through his testing and comparison of these samples, Trooper Giacalone concluded that the black smears found on the Blazer's molding were similar to the plastic used in the tool box with respect to their color, texture, and organic composition. (Id. at 1510). In his opinion, the tool box would have to be included as a possible contributor to the black smears found on the Blazer's molding. (Id. at 1511). However, Trooper Giacalone admitted that a number of other items commonly available are made of the same black polyethylene and could have made the smears. (Id. at 1516).

Additionally, a woman named Tonya Cobb, who became involved with Petitioner after Leigh Ann's death, while Petitioner was out on bond, testified to certain statements Petitioner made to her. Specifically, Ms. Cobb testified that one evening, after she had expressed a fear of walking to Petitioner's house in the dark

27

because of what happened to Leigh Ann, Petitioner told her that she had nothing to worry about. (Id. at 1470).

Ms. Cobb further testified about an incident where she arrived at Petitioner's house late one night, after being out drinking. She stated that Petitioner got out of bed, and when Ms. Cobb asked him where he was going, Petitioner laughed and stated something to the effect of, "To get a leash." (Id. at 1471). Ms. Cobb also testified that Petitioner had told her that it was possible that Leigh Ann's killer put the dog leash around her neck "to make a statement." (Id. at 1473). However, Ms. Cobb further stated that Petitioner had consistently denied any involvement in the crime, and that she was not frightened of him. (Id. at 1474-75, 1487).

The State also presented the testimony of Donald Anastasio, Petitioner's co-worker at West Virginia Paving, and an avid gun collector. Mr. Anastasio testified that, in or around November or December of 1996, Petitioner came to him and asked him if he could sell Petitioner an unregistered gun. (Id. at 1461). Mr. Anastasio did not sell Petitioner any gun; nor is there any evidence that a gun was used in this crime.

The State also presented the testimony of Tabitha Mullins, a friend of Rachel Holley. Ms. Mullins testified that, while riding in a car with Petitioner and Rachel, Rachel said that her mother never bought her anything, to which Petitioner replied, "Don't worry Rachel, she will pay, she will pay." Ms. Mullins testified

28

that she didn't know whether Petitioner meant that Leigh Ann would pay some money back or would pay in some different way. (Id. at 1457).

A foreman at West Virginia Paving, Roger L. Kelly, Jr., also testified for the State. Mr. Kelly stated that in September or October of 1996, Petitioner had told him that he thought that Leigh Ann was trying to provoke Petitioner into threatening her, so she could tape record the threat. (Id. at 1318-1319). Apparently, Petitioner told Mr. Kelly that, in order to let Leigh Ann know that he knew about the tape recorder, Petitioner mouthed the words "I'm going to kill you" to Leigh Ann. (Id. at 1308).

The State also presented the testimony of a man named Peter Jones, who had played cards with Petitioner on occasion. Mr. Jones testified that, the first time he met Leigh Ann, she had two black eyes. (Id. at 1133-1134). Mr. Jones further testified that around January of 1997, Petitioner was looking to buy a car, so he could follow his wife and she wouldn't recognize the car. (Id. at 1131). Mr. Jones further testified that Petitioner had stated that, if he saw Leigh Ann with another man, "he would kill her." (Id.) Mr. Jones was aware that Petitioner kept a ball bat behind the seat in his vehicle. (Id. at 1133).

The State also presented evidence concerning a blue dog leash believed to have been in Petitioner's possession. Denise Tyler, one of Petitioner's neighbors testified that, on several occasions,

29

she had called a humane officer about Petitioner's dog who was running loose on her property. Both Ms. Tyler, and the humane officer, Brad Fisher, testified that Mr. Fisher used a blue dog leash similar to the one found on Leigh Ann's body, to capture the dog and return it to Petitioner. (Id. at 1279-1280, 1286-1287, 1295).

### G. Petitioner's case in chief

Petitioner presented the testimony of Harold and Krista Shanafelter, neighbors of Petitioner's parents at their farm in Clay County. Mr. Shanafelter testified about the day that the police came to talk to Petitioner at the farm, and about his recollections concerning Petitioner's four-wheeler and trailer. (Id. at 1611-1617, 1620-1627). Mr. Shanafelter testified that it would be impossible to fit a tool box, like the one in which Leigh Ann's body was found, on Petitioner's trailer. He further testified that he had never seen Petitioner with such a tool box; nor had he seen such a tool box on the Holley farm. (Id. at 1617). Mr. Shanafelter also testified that he was aware that the Holleys had been using a track hoe on their property and that a hole had been dug on the property to provide water for their cattle.[3] (Id. at 1628-1632). He did not believe that Petitioner was still at the farm when the hole was dug. (Id. at 1630-1631).

---

[3] The State had implied that the hole was dug on the property to conceal Leigh Ann's body.

Krista Shanafelter testified that she had ridden in Petitioner's Blazer, and had not seen a black tool box on or in the vehicle; nor did she see such a tool box around the Holley farm, including on the night the State Police first came to the farm. (Id. at 1678-1680; 1687).

Walter Stutler also testified about the digging of the watering hole for cattle that he kept on the Holleys' farm. (Id. at 1701-1719). Mr. Stutler also testified that a tool box would not fit on the four-wheeler trailer (id. at 1722), and that he did not see such a box either in the Blazer or on the trailer on the night the State Police first came to the farm. (Id. at 1724-1725).

The defense also presented the testimony of Chris Mallory, a neighbor of the Holleys on Spring Mountain. Mr. Mallory testified that he played poker with Petitioner and his brother, Chris, about once a week. Mr. Mallory testified that Leigh Ann showed up at their poker games on occasion, and that he had never seen her with a black eye or eyes. (Id. at 1767). Mr. Mallory also did some racing with the Holleys, and he did not recall ever seeing a black plastic tool box with any of the racing equipment, or on the Holleys' vehicles. (Id. at 1769-1772). Rather, Mr. Mallory stated that Chris Holley had a welded steel tool box "made on the trailer." (Id. at 1769). On cross-examination, however, Mr. Mallory was not sure how many tool boxes were on the racing trailer. (Id. at 1776).

Lloyd and Richard Boggess, who are brothers, and friends of the Holleys, also testified.  Lloyd, who lives on Spring Hill Mountain, testified about working on race cars with the Holleys. Lloyd testified that there was no room for a tool box on Chris Holley's trailer.  (Id. at 1796).  He stated that there is a metal storage box on the right front corner of the trailer.  (Id. at 1797).  He, too, testified that he had never seen a black plastic tool box anywhere on any of the Holley properties.  (Id. 1798). Lloyd further testified that he spoke to Petitioner around 8:30 p.m. on April 3, 1997, about some parts he and Chris needed for the race car.  (Id. at 1801).

Richard Boggess also testified that there was no place on Chris Holley's trailer for a tool box, and that he had never seen a tool box like the one in question on any of the Holleys' properties.  (Id. at 1825).

Petitioner presented the testimony of Michael Mounts, an investigator hired to assist with Petitioner's defense.  Mr. Mounts testified that his investigation had revealed that the key found on Petitioner's key ring could open various tool boxes.  (Id. at 1832-1837).

Petitioner also offered the testimony of Gregory Sweeney, a former employee of West Virginia Paving, who was also involved in racing with the Holleys.  (Id. at 1889-1890).  Mr. Sweeney testified that he worked on a race car at the West Virginia Paving

32

garage with Petitioner and Chris Holley on a Wednesday evening. (<u>Id.</u> at 1891). He further stated that, on that evening, the security guard at the facility went and purchased some beer and drank with them in the garage.[4] (<u>Id.</u> at 1891-1892). Mr. Sweeney testified that Petitioner did not leave the garage that evening. (<u>Id.</u>) Mr. Sweeney further stated that he was not at the garage on the night of Thursday, April 3, 1997 (the night that Leigh Ann disappeared). (<u>Id.</u> at 1892).

Mr. Sweeney further testified that he had never seen a tool box like the one in question on Chris Holley's trailer, or around any of the Holleys' equipment at the race track, or at their homes. (<u>Id.</u> at 1893-1895). On cross-examination, however, Mr. Sweeney admitted that he had told the prosecutors that he did not remember what night he was working on the car at West Virginia Paving, and that he had seen a black plastic tool box on Chris Holley's trailer. (<u>Id.</u> at 1896-1897).

Petitioner also presented the testimony of Andy Mellert, a former neighbor of Petitioner, who also played poker with Petitioner and Chris Holley. (<u>Id.</u> at 1901-1905). Mr. Mellert stated that he had never seen Petitioner threaten or get physical with Leigh Ann on the occasions when she had been present at the

---

[4] The security guard testified that he purchased beer for the Holleys and Greg Sweeney, and drank with them on <u>April 3, 1997</u>. The security logs which could confirm the date are missing from the files at West Virginia Paving. (# 9, Ex. 11 at 912-913, 917-920, 929-931).

33

card games. (Id. at 1906). Mr. Mellert also testified that he had never seen a tool box like the one in question, either at the race track, or at any of the Holleys' properties, or at Lloyd Boggess' place. (Id. at 1907-1909).

The final defense witness was Petitioner's brother, Chris Holley. Chris testified about his and Petitioner's activities on April 3, 1997. Chris stated that he got off work at 5:00 p.m., went to pick up his kids at their babysitter's, and went home. Around 6:00 or 6:30 p.m., after his wife got home, Chris went back to the West Virginia Paving garage to work on his race car. (Id. at 1919). Chris testified that Greg Sweeney and the night guard had been in the garage on the previous evening. (Id. at 1920-1921).

Chris stated that Petitioner showed up at the garage about 15-20 minutes after he did to help with the car. (Id. at 1921-1922). Chris further testified that Petitioner made a phone call to Lloyd Boggess to see if he had some parts that they needed for the car, which he did not. (Id. at 1923). Thus, Petitioner left to go look for the parts at his house. Chris stated that Petitioner was gone for "40, 45 minutes at the most." (Id. at 1924). Chris stated that, upon his return, Petitioner was wearing the same t-shirt and jeans that he had on when he left, and that he was not "disheveled" or "dirty." (Id.) Chris further testified that he left the garage a little after 11:00 p.m. and that Petitioner had left about 10

34

minutes before him.  (Id. at 1925).

Chris further testified about the trailers he had owned.  He stated that he had owned his current trailer for about five years. He stated that the trailer was black and had a side metal box that was about two feet long and one foot wide.  (Id. at 1925-1926).  He stated that the previous trailer he owned was black and had on it a tool box large enough to walk through.  (Id. at 1926-1927).  He further stated that he did not own that trailer in 1997.  (Id. at 1927).

Chris further testified that he had never owned a tool box like the one in question, and that he had seen no such tool box at Petitioner's house, or at his father's properties, or at Lloyd Boggess' place.  (Id. at 1927-1929).  Chris did state, however, that Petitioner's neighbor, Paul Whittington, had a tool box like the one in question, which the police had allegedly confiscated. (Id. at 1929).

On cross-examination, Chris was again asked about the times that Petitioner left and returned to the garage.  He stated that Petitioner left the garage around 9:30 p.m.  He further stated that, if Petitioner told the FBI that he returned to the garage around 11:00 or 11:30 p.m., Petitioner was incorrect.  (Id. at 1930).  Chris reiterated that he never had a black plastic tool box on his race car trailer.  (Id. at 1933).  Chris further testified that he did not know whether Petitioner made any other phone calls

35

from the West Virginia Paving garage that night.  (Id. at 1937).

### H.   Closing arguments

The State painted Petitioner as a jealous and possessive man who abused his wife.  (Id. at 2004-2006).  Prosecutor Don Morris stated that Petitioner's action of burning Leigh Ann's clothing was not only malicious, but was indicative of Petitioner hiding evidence.   (Id. at 1987-1988).   He further characterized Petitioner's action of mouthing the words " I will kill you" to Leigh Ann when he thought she was carrying a tape recorder, and his attempts to acquire an unregistered gun and a car that Leigh Ann would not recognize, as evidence of premeditation and deliberation. (Id. at 1988-1989).  He attempted to bolster that characterization by reminding the jury of Petitioner's statements to Leigh Ann's mother that he would see her dead before he would see her with his children[5], and to Lisa Wiles that he would kill Leigh Ann if he ever saw her with another man, as well as statements made to various other witnesses.  (Id. at 1990-1991).

Mr. Morris suggested that Petitioner had left the West Virginia Paving garage on April 3, 1997, and headed toward his parents' house, where he knew that Leigh Ann would be dropping off the children.   Mr. Morris further argued that Petitioner

---

[5] Ms. Noffsinger testified that Petitioner made this comment in December of 1997 (after Leigh Ann's death, and presumably, while Petitioner was out on bond), when he came to Ms. Noffsinger's house while the children were visiting her.

intercepted Leigh Ann along the narrow road as she came out of his parents' driveway, and killed her there. This, he stated, would explain why no evidence of a crime was found at Petitioner's house. (Id. at 1996-1997). Mr. Morris further suggested that Petitioner moved Leigh Ann's car to his driveway after the murder. (Id. at 1997).

Mr. Morris reminded the jury of Trooper Zerkle's testimony about seeing a black plastic tool box at the Holleys' Clay County farm on April 4, 1997, and that Petitioner had a key that fit the lock on the tool box in which his wife's body was found. Mr. Morris also talked about the witnesses who testified that they had seen Petitioner's brother, Chris, in possession of such a tool box, and he suggested that Petitioner had gotten the tool box and the key from Chris. (Id. at 2000-2003). And he talked about the dog leash, and the "statement" Petitioner said the killer was trying to make with it. (Id. at 2003-2004). Mr. Morris stated that, although Petitioner would try to point the finger at someone else, he was the only person with a reason to commit this crime and the only one who knew Leigh Ann was going to be on Margy Lane around that time. (Id. at 2006).

In Petitioner's closing argument, his counsel pointed the finger at Perry Johnson, suggesting that he knew that Leigh Ann was going to drop off the children at the Holleys', and that he met her up on Spring Hill Mountain (which, Mr. Mitchell stated, explained

37

why she left her car there), that Leigh Ann and Mr. Johnson got into an argument concerning the future of their relationship, because of his being on probation for child molestation, and that Mr. Johnson had killed Leigh Ann because she was breaking up with him.  (Id. at 2026, 2059-2079).

This argument drew an objection from Prosecuting Attorney Forbes, who stated, "Shouldn't there be some factual basis for this farce?"  (Id. at 2059).  The trial court permitted the defense some latitude with this argument in light of the circumstantial nature of the case.  (Id.)

Consequently, in his rebuttal argument, Mr. Forbes attacked Mr. Mitchell's credibility, making comments such as: "John Mitchell in his opening statement lied to you ladies and gentlemen.  We know that he lied.  That lawyer lied to you . . . ." and "Now if you could make sense out of anything John Mitchell said, you're doing better than I am.  I think it proves conclusively why he is no longer a prosecutor for this county," and "Mr. Mitchell without any evidence whatsoever, . . . he's trying to make something up to explain that.  Why would he try to make it up . . . Why did Mitchell try to change that?  Why did he have to make up a reason out of wholecloth?"  (Id. at 2089, 2104 and 2107).

Mr. Forbes took a hatchet that Mr. Mitchell had brought into the courtroom, and struck a stack of papers that were on the rail in front of the jury box some eleven times, demonstrating how the

killer had attempted to chop off Leigh Ann's head in order to fit the body into the tool box.  (Id. at 2105-2106).  This conduct drew no objection from the defense.

## ANALYSIS

**A.    PETITIONER'S DUE PROCESS CLAIMS.**

### 1.   Sufficiency of the Evidence

In Ground B(3) of his Federal petition, Petitioner claims that, aside from the evidence presented by the State concerning prior instances of alleged domestic violence by Petitioner against the victim, Leigh Ann Holley, the evidence was insufficient to convict Petitioner of first-degree murder.   (# 1 at 33-35). Specifically, Petitioner states:

> The admission of evidence of prior injuries was necessary in order to permit the State to have any theory consistent with the guilt of the petitioner in this case. For in summary, the State's evidence in support of the conviction was:
>
> a)   The petitioner admits to seeing Leigh Ann Holley the evening of April 3, 1997.
>
> b)   Neither the State nor the defense produced any witnesses at trial who saw Ms. Holley after April 3, 1997.
>
> c)   Ms. Holley's vehicle was located in petitioner's driveway the morning of April 4, 1997 (in full view of the residents of the neighborhood).
>
> d)   Ms. Holley's body was found in a toolbox on May 12, 1997 which had a lock which could be opened with a key found on petitioner's key ring.

> And that is the sum of substantive evidence
> supporting this conviction for Murder in the First
> Degree. There are no witnesses to the murder. Indeed
> there is no known scene of the murder, either in Kanawha
> County or elsewhere. There is not one single shred of
> physical evidence that links the petitioner to the murder
> of Leigh Ann Holley; not on his person, not in his home,
> and not in his vehicle. There is no murder weapon . . .
> . And while the petitioner freely gave a statement to the
> police, there are no statements that inculpate the
> petitioner.

(# 1 at 34-35).

In reviewing the sufficiency of the evidence to support a

State criminal conviction on a due process challenge in a Federal

habeas proceeding, "the relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307 (1979). This standard is cited by Respondent in his

Motion for Summary Judgment. (# 8 at 55). Respondent asserts that

Petitioner has not even addressed the critical issue: "whether the

evidence presented during trial was so insufficient that no

reasonably minded juror could convict him." (Id. at 56).

Respondent relies upon to the findings made by the State

habeas court on this issue:

> [E]ven if the court were to ignore the evidence
> Petitioner claim[s] was inadmissible, there is more than
> sufficient evidence to support the conviction. Even a
> cursory review of the record reveals, at a minimum, the
> following:

a. Petitioner and the victim were involved in divorce proceedings and a custody dispute.

b. The victim had lost a considerable amount of weight since moving out of the marital home but the Petitioner had told police that she had come to the marital home on the night of her disappearance to retrieve a pair of her blue jeans.

c. Petitioner initially denied having any knowledge that the victim's car was parked in the driveway. He later amended this story by saying that the victim had parked her car in his driveway and that she was still standing in his driveway when he left on the night she disappeared.

d. Petitioner had carried a ball bat in his vehicle.

e. The victim was killed by being struck in the head by a tubular object.

f. A Humane Officer had taken a blue nylon leash to Petitioner's house when he took Petitioner's dog home from a neighbor's house where it had been causing trouble.

g. The victim had a blue nylon dog leash around her neck when her body was found.

h. Petitioner's family denied that anyone in the family had a tool box like the one in which the victim's body was found. Nonetheless, Petitioner had a key that fit the lock on the box in which the body was found.

i. Petitioner was reportedly drinking beer and working on his brother's race car at the West Virginia Paving complex in Dunbar on the night the victim disappeared. However, the paperwork for the pertinent time period that would have allowed the night watchman at West

> Virginia Paving to confirm the date on
> which the consumption of beer occurred
> was seemingly stolen from an office at
> the West Virginia Paving complex.

(# 1, Ex. H at 17-18).   Based upon these findings of fact, the

State habeas court made the following conclusions of law:

> As noted, the foregoing does not constitute a detailed
> recitation of all of the evidence supporting Petitioner's
> conviction.   It does however, illustrate the fact that
> there was more than sufficient evidence upon which the
> jury could reasonably rely in concluding that Petitioner
> was guilty as charged.

(Id. at 18).   Respondent contends that Petitioner "has not offered

a single scrap of evidence to rebut the above contentions."   (# 8

at 58).

Petitioner responds that there was not one shred of physical

evidence linking the murder to Petitioner.   He argues that it is

reasonable to conclude that Petitioner was convicted on such weak

evidence due to the jury hearing inadmissible evidence of Leigh

Ann's fear, and due to ineffective assistance of counsel.   (# 13 at

13-14).

Based upon an exhaustive review of the evidence of record, the

undersigned concludes that Petitioner has not met his burden of

rebutting, by clear and convincing evidence, the presumption of

correctness of the State habeas court determination of factual

issues, as required by 28 U.S.C. § 2254(e)(1).   The undersigned

proposes that the presiding District Judge **FIND** that:

> 1.   Viewing the evidence in the light most favorable to
> the State, any rational trier of fact could have found

42

the essential elements of first degree murder beyond a reasonable doubt;

2.   The State habeas decisions on this ground were neither contrary to, nor involved an unreasonable application of clearly established Federal law; and

3.   The State habeas decisions on this ground were based on a reasonable determination of the facts as presented.

## 2.   Prosecutorial Misconduct

In Ground B(1) of his Federal petition, Petitioner asserts that he was denied a fair trial as guaranteed under the Due Process Clause of the Fourteenth Amendment because of alleged misconduct by the prosecuting attorney.  Petitioner's federal petition states:

A review of the trial transcript in this matter illustrates a textbook example of how professional attorneys should not behave in criminal litigation in America.  The following are verbatim exchanges between Mr. Mitchell and Mr. William Forbes, then Prosecuting Attorney of Kanawha County, at the trial of this matter:

a)   Mr. Mitchell: "Is he going to tell me how to do my job?

Mr. Forbes: "Somebody should."  TT 1045

b)   Mr. Forbes: [in speaking about Mr. Mitchell:] "...is he trying to trash a dead woman?"

Mr. Mitchell: "You should be ashamed of yourself."

c)   Mr. Forbes:    [during Mr. Mitchell's closing argument:] "Shouldn't there be some factual basis for this farce?

Mr. Mitchell:   "He keeps interrupting me, Judge. Let's make sure he's satisfied. TT 2060-2061

43

d)   Mr. Forbes:      [in closing argument:]
"John Mitchell in his opening statement lied to you ladies and gentlemen. We know that he lied. That lawyer lied to you..." TT 2089

e)   Mr. Forbes:      [in closing argument:]
"Now if you could make sense out of anything John Mitchell said, you're doing better than I am. I think it proves conclusively why he is no longer a prosecutor for this county." TT 2104

f)   Mr. Forbes:      [in closing argument:]
"But Mr. Mitchell without any evidence whatsoever, . . . he's trying to make something up to explain that. Why would he try to make it up . . . Why did Mitchell try to change that? Why did he have to make up a reason out of wholecloth? TT 2107

(# 1 at 20-21). Petitioner's federal petition further states:

The conduct of Mr. Forbes became even more egregious at trial when, during the closing arguments, Mr. Forbes used a hatchet/axe to loudly strike, cut, shred, and chop a stack of paper sitting on the jury rail. Mr. Forbes struck the jury rail some eleven times during his closing with the hatchet.

The only link between Mr. Forbes' obviously theatrical and inflammatory actions and the evidence was the medical examiner's testimony that the victim had sustained some nine to ten neck wounds, some superficial and all post-mortem, caused by some type of blunt instrument. TT 1573. There was no axe or hatchet ever recovered as evidence in this case nor introduced as an exhibit. Indeed there was no evidence produced that proved an axe or hatchet caused the post-mortem wounds to the victim.

(Id. at 22).

Petitioner contends that "[t]he Prosecuting Attorney's

44

remarks, arguments, and actions in this trial exhibit all the earmarks of a zealous elected prosecutor crossing the line of fairness and impartiality in a well-publicized, high profile murder case" and made Petitioner "the poster child for the domestic violence cause." (Id. at 26-27). Petitioner further contends that Mr. Forbes' comments that Mr. Mitchell was a "liar" were "absolutely impermissible." (Id. at 27) Petitioner asserts that "[i]t is certainly no stretch to conclude that the jurors, or one or more of them, were affected by such comments to the point where the petitioner was deprived of due process of law . . . ." (Id.)

Respondent's Motion for Summary Judgment states:

> During trial Mr. Forbes exhibited a distasteful mix of hubris and arrogance. Even if his conduct did not deprive the Petitioner of his Fourteenth Amendment right to due process or his right to counsel under the Sixth Amendment, it should be considered repugnant by any right minded prosecutor. See Darden v. Wainwright, 477 U.S. 168, 180 nn.11 & 12 (1986)(prosecutor's closing argument which referred to the defendant as an animal, and stated that he should not be out of his cell unless he has a leash on him and a prison guard at the other end of that leash "deserves the condemnation it has received from every court to review it . . .") Id. at 179. But the individual culpability of Mr. Forbes is not at issue, the issue before this Court is whether Petitioner received a fair trial. See United States v. Argurs, 427 U.S. 97, 110 (1976)(prosecutorial misconduct should be evaluated not on the basis of culpability but by its effect on the fairness of the trial).

(# 8 at 24-25). The Motion for Summary Judgment further states:

> In order to prove a due process violation, petitioner must establish that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "Prejudice in

45

such matters is an imponderable difficult to discern upon
a cold record. The effect of an argument upon the jury
is best gauged by those who observe it." *Carter v.
United States*, 437 F.2d 692, 694 (D.C. Cir. 1970). "Even
if the prosecutor's conduct is improper or even
'universally condemned,' we can provide relief only if
the statements were so flagrant as to render the entire
trial fundamentally unfair." *Bowling [v. Parker]*, 344
F.3d [487] at 512 [(6th Cir. 2003)].

(Id. at 29). Respondent asserts that Petitioner has offered no

evidence to support a finding that his trial was fundamentally

unfair as a result of Mr. Forbes' conduct. "Petitioner simply asks

this Court to read Mr. Forbes' statements, and infer that they

deprived the Petitioner of a fair trial . . . . At a bare minimum,

Petitioner must prove how Mr. Forbes' behavior prejudiced the

Petitioner as opposed to the State." (Id. at 31).

Respondent's Motion addresses in detail each incident of

misconduct claimed by the Petitioner. Specifically, Respondent

contends that Mr. Forbes' comments were not a personal attack on

either Petitioner or his counsel. (# 8 at 35). Concerning Mr.

Forbes' comment in his summation where he called Mr. Mitchell a

liar, Respondent contends that the statement was in response to

statements made by Mr. Mitchell in his opening statement which were

geared toward convincing the jury that, "prior to his arrest,

Petitioner had fully cooperated with the State in its attempts to

locate his missing wife." (Id. at 38). Respondent states:

In the instant case, Mr. Forbes was not injecting a
personal opinion; he was merely commenting on the
evidence. His intent was not to slander Mr. Mitchell,
but to demonstrate to the jury that there *was* evidence

46

> demonstrating that the Petitioner had, in fact, lied to
> the State Police.  Indeed, the day after Petitioner
> informed Trooper Zerkle that he had no idea why the
> victim's car was in his driveway, he admitted to
> Detective Flint that he had lied . . . . To correct this
> erroneous statement did not deny Petitioner a fair trial.
> It ensured that the jury would hear the truth.

(Id. at 38, 40).

In his Reply, Petitioner again contends that Mr. Forbes'
improperly injected his personal opinion during the trial and
"repeatedly smeared the petitioner's attorney in front of the jury
(and also smeared the petitioner with a multitude of hearsay
statements about his relationship with the victim for which there
were no witnesses to cross-examine)."  (# 13 at 9-10).  Petitioner
further submits that the State habeas court's factual findings were
unreasonable in light of evidence adduced at the omnibus hearing.
(Id.)

The Supreme Court has held that "a criminal conviction is not
to be lightly overturned on the basis of a prosecutor's comments
standing alone, for the statements or conduct must be viewed in
context; only by so doing can it be determined whether the
prosecutor's conduct affected the fairness of the trial."  United
States v. Young, 470 U.S. 1, 11 (1985).  Courts have applied what
has come to be known as the "invited response" or "invited reply"
rule, whereby courts look at the remarks within the context of the
entire trial to determine whether the prosecutor's behavior
amounted to prejudicial error.  Id. at 12.  "In other words, the

47

Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." (Id.) As stated by Respondent in his Motion for Summary Judgment, "prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." Caldwell v. Russell, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), abrogated on other grounds, Mackey v. Dutton, 217 F.3d 399, 406 (6th Cir. 2000); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

In the Order denying Petitioner's State habeas petition, Judge Bloom made the following findings of fact:

> The instances of personal sniping between Prosecuting Attorney Forbes and Attorney Mitchell were brief exchanges in the midst of a lengthy trial.

> \* \* \*

> Petitioner also complains that Prosecuting Attorney Forbes struck the shelf in front of the jury box with a hatchet to simulate the postmortem injuries to Leigh Ann Holley's neck. The prosecutor's theory was that the postmortem blows, which nearly severed her neck, were inflicted so that Leigh Ann Holley's body could be forced

48

into the tool box.

> The hatchet Prosecuting Attorney Forbes picked up was not used in connection with the crime.  Rather, it had been brought in by defense counsel for illustrative purposes.

(# 1 , Ex. H at 7-8).  Based upon these findings of fact, Judge

Bloom made conclusions of law as follows:

> while the sniping exchanges between Prosecuting Attorney Forbes and Attorney Mitchell do not reflect credit on either of them, the exchanges did not rise to the level of a constitutional violation.

> As to Prosecuting Attorney Forbes' actions in using the hatchet defense counsel had brought into the courtroom to simulate the post-mortem injuries inflicted on the victim, the Court notes that there could be no confusion that the hatchet in the courtroom was not used in the crime.  Nor was Prosecuting Attorney Forbes attempting to demonstrate the manner in which Leigh Ann Holley had been killed.  While the Court might find the actions of Prosecuting Attorney Forbes to have been in poor taste, his actions were not so egregious as to deprive Petitioner of his right to a fair trial and due process of law.

> Petitioner received the fair trial to which he is constitutionally entitled.

(Id. at 15).

The undersigned has conducted a thorough review of the trial transcript.  The undersigned finds the exchanges between Mr. Forbes and Mr. Mitchell to be highly unprofessional.  Nevertheless, given that the evidence was sufficient to find Petitioner guilty of murder, and looking at the statements in the context of the entire proceedings, the undersigned proposes that the presiding District Judge **FIND** that the comments did not infect the trial with unfairness or deny Petitioner due process.  See Buell v. Mitchell,

49

274 F.3d 337, 364-65 (6th Cir. 2001); Kinder v. Bowersox, 272 F.3d 532 (8th Cir. 2001); Sublett v. Dormire, 217 F.3d 598 (8th Cir. 2000); United States v. Sanchez-Sotelo, 8 F.3d 202, 211 (5th Cir. 1993); Simmons v. Bowersox, 235 F.3d 1124, 1136-37 (8th Cir. 2001). The undersigned further proposes that the presiding District Judge **FIND** that the State courts' decisions denying relief on this claim were not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent; nor were those decisions based upon an unreasonable determination of the facts as presented.

### 3.  Admission of "Fear" or "Bad Character" Evidence

In Ground B(2) of his Federal petition, Petitioner claims that the State's introduction of evidence that Leigh Ann was fearful of Petitioner denied him a fair trial.  The petition states, "[t]he theory of the prosecution purportedly was that if the victim was fearful of the petitioner, the petitioner therefore must have been her killer."  (# 1 at 27).

Prior to trial, the trial judge held that the testimony of various witnesses who claimed that, at some point, the victim had stated that she feared Petitioner was admissible under a hearsay exception, because it was offered to show the victim's state of mind concerning her willingness voluntarily to go to Petitioner's house alone on the night she disappeared.  (# 9, Ex. 9 at 6).  The jury was given a cautionary instruction concerning this evidence. (#9, Ex. 11 at 605-606).  Petitioner now contests this ruling,

stating that whether Leigh Ann voluntarily went to Petitioner's house on April 3, 1997 was irrelevant.  Petitioner states:

> In the instant case, the flaw in the Trial Court's analysis is that there was no dispute in the record at any point that the victim did anything other than voluntarily drop her children off at the petitioner's parents' house on the evening of April 3, 1997.  The State of West Virginia never at any time during the trial of this matter, suggested that the victim had been kidnapped from her apartment or somehow forced to go to either the petitioner's parents or the petitioner's house on the evening of April 3rd. * * * [T]he justification given by the Trial Court to admit this evidence was completely unfounded and in violation of petitioner's constitutional rights.

(# 1 at 29).

Petitioner argues further that his constitutional right to due process of law was violated when the prosecution was permitted to elicit testimony which was designed to convince the jury that Petitioner was a person of bad character.  (# 1, at 30).  Specific topics included damaging Leigh Ann's car, following or "stalking" Leigh Ann, and verbally abusing her.  (# 1, at 31-33).  He argues that evidence of Leigh Ann being bruised was admitted to imply that Petitioner inflicted the bruises, without any evidence to support that implication.  (# 1, at 33).

It appears to the court that this "bad character" evidence is simply additional reasons why Leigh Ann would fear her estranged husband.  Respondent addresses all of Petitioner's assertions regarding "fear" and "bad character" evidence under the general topic of "fear" evidence.

Respondent asserts that "relevancy is a question of state evidentiary law, and is not a cognizable federal habeas corpus claim." (# 8 at 51). Respondent further asserts that, even excluding the "fear" evidence, there was sufficient evidence to convict Petitioner, and that Petitioner "is not permitted to reargue state admissibility issues, or to assume that these alleged errors in the trial court's evidentiary rulings amount to a per se violation of Petitioner's federal constitutional rights." (Id. at 49, 51). Respondent's motion further states:

> At its essence, Petitioner's argument is one of state evidentiary law, devoid of any federal constitutional issues. Petitioner's arguments (and its several subparts) focus upon the *admissibility* of the evidence pursuant to state law, and does not articulate how the circuit court's Order "resulted in a decision contrary to or involving an unreasonable application of *federal law as determined by the Supreme Court of the United States*, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2).

(Id. at 48).

Petitioner's Response to Respondent's Motion for Summary Judgment asserts that the State habeas court's finding on the issue was unreasonable. (# 13, at 11). The remainder of Petitioner's Response focuses on his Confrontation Clause claim concerning the "fear" evidence, which is addressed separately in this Proposed Findings and Recommendation. (# 13 at 10-12).

In the Order denying Petitioner's State habeas petition, Judge Bloom found as follows:

52

During the testimony of Leigh Ann Holley's mother, Karen Noffsinger, the trial court admonished the jury "with respect to the issue of fear" that "[a]ny evidence that you may hear tendered on behalf of the Prosecuting Attorney relating to the victim, Leigh Ann Holley, of being in fear of the defendant, Ricky Melvin Holley, is to be considered by you not as evidence that the defendant, Ricky Melvin Holley, is guilty of killing the victim, Leigh Ann Holley; but rather, is to be considered by you only as to the reasonableness of any assertions which may be made that the victim, Leigh Ann Holley, may have *voluntarily* gone alone to the residence of the defendant, Ricky Melvin Holley, on April 3, 1997."

Petitioner had originally told the investigating officers that he did not know why his estranged wife's car was in his driveway. He later altered his story, claiming that he had run into Leigh Ann near his house when he came home to look for brake linings for the race car he and his brother were working on at West Virginia Paving. He claimed that Leigh Ann *drove up to the house, alone*, and asked him to let her retrieve some of her jeans from the house. According to Petitioner, he refused to let her have her clothes. He told the police that, when he left to go back to West Virginia Paving, Leigh Ann was still standing in his driveway.

* * *

The trial judge expressly stated that he had given a great deal of time and thought to "what was a proper area of inquiry and what wasn't." As to a minimal number of hearsay statements relating to the victim's fear of Petitioner, he appropriately ruled that they would come in, with a limiting instruction, for purposes of allowing the jury to assess the likelihood that Leigh Ann Holley would have appeared *alone* at the Petitioner's home on the night she disappeared. Specifically, the trial judge stated that the evidence was "being offered to establish the reasonableness of whether . . . she went voluntarily to his house on the evening of April 3rd[.]"

* * *

The trial court did not indiscriminately admit all of the hearsay evidence the State wanted to introduce. Rather, the court ruled that some of the hearsay statements were inadmissible because they were too prejudicial and that

53

the cautionary instruction could not offset the prejudice.[6]

(# 1, Ex. H at 8-9).

Based upon these findings of fact, Judge Bloom concluded as a matter of law that "even if the Court were to ignore the evidence that Petitioner claims was inadmissible, there is more than sufficient evidence to support the conviction." (Id., at 17-18). Judge Bloom further ruled that

> The Court does not conclude that the evidence to which Petitioner now objects was improperly admitted. The trial court conducted the appropriate analysis and determined its admissibility. In addition, the trial court tempered the admission of "fear" testimony from the victim's mother by giving a cautionary instruction or limiting instruction to the jury.
>
> Even if the evidence were deemed to be improperly admitted, it would only constitute ordinary trial error and would not rise to the level of a constitutional violation in this case.
>
> Although circumstantial, the evidence supporting Petitioner's conviction would render the introduction of the hearsay and character evidence harmless beyond a reasonable doubt, in any event.

(Id. at 18-19).

Whether or not the so-called "fear" evidence should have been admitted under the West Virginia Rules of Evidence, it is plain

---

[6] Included as exhibits to the Respondent's Motion for Summary Judgment are the State's 404(b) notices and Petitioner's objections to the admission of that evidence. (# 9, Exs. 5-8). It is evident from the record that the trial court prohibited the State from using, as evidence at trial, numerous "bad acts" described in the State's notices, all of which support the inference that Leigh Ann reasonably feared Petitioner.

that the evidence did not render Petitioner's trial so fundamentally unfair as to constitute a denial of his federal constitutional rights. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that:

> 1.   Petitioner has not demonstrated a violation of his right to due process based upon the admission of this evidence;
> 2.   Petitioner has not met his burden of rebutting, by clear and convincing evidence, the presumption of correctness of the State habeas court determination of factual issues, as required by 28 U.S.C. § 2254(e)(1);
> 3.   The State court decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Federal law; and
> 4.   The State court decisions denying Petitioner relief on this claim were not based upon an unreasonable determination of the facts.

### 4.   Confrontation Clause issue

On April 6, 2004, Petitioner filed an "Addendum" to his Federal petition, in which he seeks to raise a claim under the Confrontation Clause of the Sixth Amendment. (# 7). Petitioner elaborates on this issue in his Response:

> Petitioner claims the introduction of the "fear" evidence violated his Sixth Amendment right to be confronted with the witnesses against him. This right was articulated in <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980). In that case, the United States Supreme Court held that such hearsay was not admissible under the Confrontation Clause unless it met an adequate indicia of reliability. *Id.* at 66. The two ways to show reliability were either to fall under a firmly rooted hearsay exception or bear particularized guarantees of trustworthiness. *Id.* at 66.
>
> In the instant case, petitioner contends that the "fear" evidence introduced did not meet either criteria and thus violated his Sixth Amendment rights. Indeed

> some of the evidence, such as bruises on the victim,
> contained no evidence linking the testimony with the
> petitioner.
>
>        The original trial court permitted the introduction
> of hearsay statements of the victim that she feared for
> her life.  Petition at 28-29.  Petitioner contends this
> was a blatant violation of the Confrontation Clause. * *
> *  Petitioner contends that this is yet another example
> of  an  unreasonable  finding  by  the  Circuit  Court.
> Petitioner  contends  the  elimination  of  the  "fear"
> evidence  effectively  eliminates  the  majority  of  the
> evidence  presented  by  Mr.  Forbes  at  trial  and  most
> certainly would have resulted in an acquittal.

(# 13 at 10-11).  In support of his claim, Petitioner relies upon

the recent Supreme Court ruling in Crawford v. Washington, 541 U.S.

36, 124 S. Ct. 1354 (2004), in which the Court held that out-of-

court statements that are "testimonial" are barred, under the

Confrontation Clause, unless witnesses are unavailable and the

defendants had a prior opportunity to cross-examine the witnesses,

regardless of whether such statements are deemed reliable by the

court.

Respondent's Motion for Summary Judgment contends that

Petitioner has failed to establish that the ruling in Crawford

meets the exception under Teague v. Lane, 489 U.S. 288 (1989), for

applying a new rule of constitutional law.   (# 8 at 53).   In

Teague, the Supreme Court held that "[u]nless they fall within an

exception to the general rule, new constitutional rules of criminal

procedure will not be applicable to those cases which have become

final before the new rules are announced."   489 U.S. at 310.

Federal habeas courts "must apply Teague before considering the

merits of the claim." <u>Casperi v. Bohlen</u>, 510 U.S. 383, 389 (1994).
Respondent asserts that Petitioner has failed to offer any factual
or legal support for his claim that <u>Crawford</u> applies to the instant
case.

Furthermore, Respondent contends that

> [u]nlike the statements in <u>Crawford</u>, the victim's
> statements in the instant case were neither testimonial
> nor hearsay. Instead, they were remarks made by the
> victim to friends and family prior to her death. They
> were not testimonial; they were not taken under an oath,
> nor did the statements result from police interrogation.
> They were personal comments which constituted
> circumstantial evidence of her state of mind on the
> evening of her disappearance. Whether the statements
> were true was not an issue. Her subjective
> interpretation of the facts, which she communicated to
> her friends, was the issue. The victim had informed
> several people that she was *subjectively* afraid of her
> husband. The focus of the inquiry at trial was how this
> subjective fear undermined the defense's theory that the
> victim had voluntarily accompanied Petitioner to his
> home.

> \* \* \*

> At the time the victim made these statements she was
> not his accuser, nor did the State deny the Petitioner
> the legal right to cross-examine her when she made these
> statements: because the statements were not testimonial
> no such right existed.

(# 8 at 54-55).

Petitioner's Response to the Motion for Summary Judgment
asserts that the ruling in <u>Crawford</u> did not change or modify the
Court's interpretation of the Confrontation Clause, but rather
clarified its rationale. (# 13 at 12). Thus, Petitioner contends
that the court need not do a <u>Teague</u> analysis. Petitioner further

asserts that Leigh Ann's statements concerning her fear of Petitioner were, in fact, "testimonial." (Id.) Petitioner, however, does not elaborate on these points.

In Pointer v. Texas, 380 U.S. 400, 403 (1965), the Supreme Court held that the "right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment." The court further held that this right includes the right to cross-examine those witnesses. Id.

In Turner v. Louisiana, 379 U.S. 466, 472-473 (1965), the Court held that "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." The Court further stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974).

In Ohio v. Roberts, 448 U.S. 56 (1980), however, the Court held that statements made by unavailable witnesses are not necessarily prohibited by the Confrontation Clause, simply because the witness is not present for cross-examination. Rather, the Roberts test subjects the evidence to a hearsay analysis under

58

State evidence rules.

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Id. at 66; see also Lilly v. Virginia, 527 U.S. 116, 125 (1999).

In Crawford, the Court summarized the ruling in Roberts as follows:  "The Roberts test allows a jury to hear evidence, untested by the adversary process, based upon a mere judicial determination of reliability."  124 S. Ct. at 1370.  The Court stated, "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"  Id.  Thus, Crawford overturns Roberts to the extent that Crawford requires that testimonial statements must have been subjected to cross-examination to be admissible.

Assuming without deciding that the Crawford ruling meets the requirements of Teague, and can be retroactively applied to this case, the question before the court is whether or not the deceased victim, Leigh Ann Holley, was a "witness" against Petitioner, and whether her statements were "testimonial" in nature, so as to require a Confrontation Clause analysis.  The Court noted that "not all hearsay implicates the Sixth Amendment's core concerns."  Id.

at 1364.   "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusions under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted."   Id.

The Supreme Court declined to provide a specific definition of the term "testimonial statements" in Crawford.   However, citing to Webster's An American Dictionary of the English Language, published in 1828, the Court stated that  "witnesses against the accused" are "those who bear testimony," and "'[t]estimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 124 S. Ct. at 1364. Thus, "an accuser who makes a formal statement to government officials bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."   Id.

The Court provided examples of "testimonial" statements from briefs submitted in Crawford: "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the

60

statement would be available for use at a later trial; <u>ex</u> <u>parte</u> testimony at a preliminary hearing; [s]tatements taken by police officers in the court of interrogations." <u>Id.</u>

It is plain that the various statements attributed to the victim, Leigh Ann Holley, to the effect that she was in fear of Petitioner, were not testimonial. None of the statements were made to persons in authority; they were comments to family and friends. None of the statements were made under oath; they were part of normal conversation. None of the statements were given in a court-related context where Petitioner would have expected to have an opportunity to cross-examine them; they were private remarks. Thus, the undersigned proposes that the presiding District Judge **FIND** that the admission of such statements at Petitioner's trial did not violate Petitioner's rights under the Confrontation Clause of the Sixth Amendment.

### 5. Refusal to strike juror for cause

During the individual voir dire of the jury panel, a potential juror informed the court and the parties that she had been a victim of domestic violence, and that the criminal case against her husband had been prosecuted by Assistant Prosecuting Attorney Donald Morris, who was also prosecuting the instant case. The potential juror, herein referred to as L.S., stated that she had avoided any conversations about this case because "[she didn't] want to have to think about anything that goes back to [her] thing

with domestic violence."   (# 9, Ex. 11 at 24).

L.S. had previously indicated on a jury questionnaire that she had already formed an opinion concerning Petitioner's guilt. During individual voir dire, she stated that she had reconsidered the matter and had decided that she could separate her personal experience from the instant case.  (Id. at 32-33).  The trial court denied the defense's motion to strike this juror for cause; Petitioner used one of his peremptory strikes to remove her from the panel.   In Ground B(4) of his Federal petition, Petitioner claims that the failure of the trial court to strike this juror for cause violated his right to due process.  (# 1 at 35-36).

Quoting from the Supreme Court's decision in Wainright v. Witt, 469 U.S. 412, 420 (1985), Respondent states that "[a] trial judge's determination of potential juror bias . . . is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. § 2254(d)."  (# 8 at 58).  Respondent further contends that

> since Petitioner chose to cure the alleged failure of the trial court by peremptorily striking juror L.S., he has not pled a federally cognizable cause of action.  In United States v. Martinez-Salazar, 528 U.S. 304 (2000), the United States Supreme Court held that if a trial court refuses to strike a potentially biased juror for cause, and the defendant subsequently chooses to exercise a peremptory challenge to cure the trial court's error, if that defendant is subsequently convicted by a jury in which no biased juror sat, he has not been deprived of any federal constitutional right.

(Id. at 59-60).

The State habeas court found that "without prompting by the

Court or counsel for either party, L.S. expressed her belief in our system of justice whereby an accused enters a trial with a presumption of innocence." (# 1, Ex. H at 10). Based upon these factual findings, the State habeas court held that "[t]he trial court did not err in refusing to strike L.S. for cause. This potential juror assessed her own ability to sit as an impartial juror in Petitioner's trial and determined that she could, in fact, be fair." (Id. at 19).

The undersigned proposes that the presiding District Judge **FIND** that, because Petitioner chose to use a peremptory strike to remove L.S. from the jury panel, Petitioner has not stated a cognizable due process claim. The undersigned further proposes that the presiding District Judge **FIND** that the State courts' decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of clearly established Federal law; nor were the decisions rendered based upon an unreasonable determination of the facts.

### 6. Venue issue

In Ground B(5) of his federal petition, Petitioner asserts, inter alia:

> this matter is absent of any evidence supporting venue
> for a murder charge in the State of West Virginia and/or
> more particularly, in Kanawha County, West Virginia. The
> State produced the body of Leigh Ann Holley encased in a
> trunk and floating in an interstate navigable river. The
> fact that the body was discovered in Kanawha County, West
> Virginia, does not give rise to jurisdiction on this
> venue for the crime of murder absent some other evidence

63

or fact.  Petitioner respectfully submits there is none.
(# 1 at 37).  Petitioner claims that the State's failure to prove
venue denied him due process.  (Id.)

Respondent contends that Petitioner's argument is simply an
extension of his insufficient evidence claim and that the State
habeas court's findings are supported by the record and have not
been  sufficiently  disputed  by  Petitioner.   (#  8  at  63).
Accordingly, Respondent asserts that the jury's finding that the
offense occurred in Kanawha County was "clearly reasonable."  (Id.)
Petitioner did not re-address this issue in his Response to the
Motion for Summary Judgment.

Concerning the venue issue, the State habeas court found as
follows:

> Petitioner argues that Leigh Ann Holley's body was found
> floating on a navigable river in Kanawha County but that
> this is insufficient to give rise to jurisdiction or
> venue in Kanawha County for the crime of murder.
>
> Leigh Ann Holley was in Kanawha County on the night of
> her disappearance.  Her body was found in Kanawha County.
> Her  car  remained  in  Kanawha  County  after  her
> disappearance.   There  is  no  evidence  that  she  left
> Kanawha County between the time of her disappearance and
> the time her body was discovered.  The dog leash found
> draped around her neck was consistent with a leash that
> jurors could conclude had been left at Petitioner's home
> in Kanawha County.
>
> The trial court expressly found and concluded that "there
> is circumstantial evidence upon which one could conclude
> by a preponderance of the evidence that venue lies in
> Kanawha County[.]"

(# 1, Ex. H at 10).  Based upon these factual findings, the State

habeas court concluded as a matter of law that, because venue must only be proven by a preponderance of the evidence under West Virginia law, and may be proven by circumstantial evidence, venue was proper in Kanawha County. (Id. at 19).

Petitioner's claim that the State failed to prove where the murder occurred is both an issue of State law and an issue of sufficiency of the evidence. Under West Virginia law, venue is not an essential element of the crime of murder, and need only be proven by a preponderance of the evidence. See State v. Burton, 254 S.E.2d 129 (W. Va. 1979). As a State law issue, this is not a cognizable claim and should be dismissed.

If the issue is considered as questioning the sufficiency of the evidence, then Petitioner is entitled to habeas corpus relief only if it is found that, upon the evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979). Upon a review of the evidence, the court concludes that the jury, as a rational trier of fact, had ample evidence from which to find, beyond a reasonable doubt, that Petitioner committed the murder of Leigh Ann Holley in Kanawha County, West Virginia.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that the State court decisions denying Petitioner's claim that the State failed to adequately prove venue were neither contrary to, nor an unreasonable application of

clearly established Federal law; nor were the decisions based upon an unreasonable determination of the facts as presented.

### 7.   Petitioner's absence from hearing

In Ground B(5) of his Federal petition, Petitioner also claims that his due process rights were violated when he was absent from a telephonic hearing in which the trial court made rulings on certain evidentiary issues prior to trial.  The petition states:

> The record in this matter will reflect a hearing was held on or about April 22, 1997, by telephone.  It was purportedly at this hearing that the Trial Court made key evidentiary rulings regarding the admissibility of hearsay testimony at trial.
>
> Petitioner did not participate in said hearing, nor did petitioner ever voluntarily and knowingly waive his right to participate in this key portion of the proceedings against him.
>
> The failure of the State to provide the petitioner with the right to be present and to participate in his own defense violates petitioner's due process rights under the United States and West Virginia Constitutions.

(# 1 at 37).

Respondent's Motion for Summary Judgment states:

> A close review of the trial transcript from the April 23, 1999, hearing clearly supports the circuit court's findings.  No new arguments of law were presented, nor did the circuit court discuss any matters outside the scope of the previous hearing which had been attended by the Petitioner.  Thus, Petitioner was not denied his federal constitutional right to be present.  See United States v. Gagnon, 470 U.S. 522, 525 (1985) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934))(presence of a defendant is protected by the due process clause of the Fourteenth Amendment only "whenever his presence has a relation, reasonably substantial to the fullness of his opportunity to defend against the charge . . . [T]he presence of a defendant is a condition

of due process to the extent that a fair and just hearing
would be thwarted by his absence, and to that extent
only.")

(# 8 at 64-65).   Petitioner did not re-address this issue in his

Response to the Respondent's Motion for Summary Judgment.   (# 13).

The State habeas court made findings of fact that

there was no objection to Petitioner's absence.  Further,
the State correctly observes that the trial judge used
the telephone conference to announce his rulings on the
suppression issues.  These issues had been raised and
addressed in an earlier evidentiary hearing at which
Petitioner was present.

* * *

This issue was not raised by Petitioner in *Defendant's
Petition for Appeal* filed on February 23, 2001.

(# 1, Ex. H, at 11).   The State habeas court made conclusions of

law as follows:

This issue is deemed waived due to the fact that it was
not raised by Petitioner in *Defendant's Petition for
Appeal*, filed on February 23, 2001.

Even if not waived, this argument lacks merit.

The telephone conference consisted of nothing more than
the trial judge announcing his rulings on the suppression
issues.   The State has correctly characterized the
telephone conference as the equivalent of a written order
setting forth a court's rulings.   There was no evidence
taken and no arguments made.

The telephone conference was not a critical stage and
Petitioner's absence from same does not constitute error,
much less error of constitutional magnitude.

(# 1, Ex. H at 19-20).

As noted by Respondent in his Motion for Summary Judgment, a

defendant has a Fifth Amendment right to be present at a proceeding

67

"whenever his presence has a relation, reasonably substantial, to fulfill his opportunity to defend against a charge." United States v. Gagnon, 470 U.S. 522 (1985). Thus, "'the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence and to that extent only.'" Id. (quoting Snyder v. Mass., 291 U.S. 97 (1934)). In Kentucky v. Stincer, 382 U.S. 730, 745 (1987), the Supreme Court stated that "this privilege of presence is not guaranteed when presence would be useless or the benefit but a shadow."

Petitioner has neither disputed the facts found by the State habeas court nor demonstrated that the telephone conference was anything more than an oral recitation of court rulings. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the State court decisions denying Petitioner relief on this basis were neither contrary to, nor an unreasonable application of, clearly established Federal law; nor were the decisions based upon an unreasonable determination of the facts as presented.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.

In Ground A of his Federal petition, Petitioner has alleged that his trial counsel was ineffective in several respects. First, Petitioner claims that his counsel failed to investigate and introduce evidence which he claims supported his innocence. (# 1 at 14-20). Second, Petitioner claims that his counsel failed to

object or move for a mistrial after the prosecutor had engaged in misconduct that prejudiced his defense. (<u>Id.</u> at 20-25). Third, Petitioner claims that his counsel failed to object to "improper" voir dire by the State, or to ask for curative instructions. (<u>Id.</u> at 25). Fourth, Petitioner claims that his counsel had no recognizable strategy for voir dire. (<u>Id.</u>) Fifth, Petitioner claims that his counsel failed to object to the admission of "improper" character evidence. (<u>Id.</u> at 26).

In <u>Strickland v. Washington</u>, 466 U.S. 688 (1984), the United States Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 687-91. The court further held that, "judicial scrutiny of counsel's performance must be highly deferential." <u>Id.</u> at 689. Furthermore, the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254, "adds a layer of respect for a state court's application of the legal standard." <u>Holman v. Gilmore</u>, 126 F.3d 876, 881 (7th Cir. 1997). Using this standard, based upon all of the evidence of record, the court will address the merits of each of the allegations concerning ineffective assistance of counsel in the order they were presented by Petitioner.

### 1.   **Failure to introduce evidence**

Several witnesses gave statements to the police concerning an incident that occurred on Spring Hill Mountain around the time that Leigh Ann Holley was last seen in that area.  A witness named Dana Samples told police that, at approximately 9:30 p.m.[7] on April 3, 1997, while driving home on Chestnut Road, he observed a white female, possibly in her twenties, with long stringy blonde hair, weighing approximately 120-125 pounds, standing on the side of the road.  (# 1, Ex. A to Ex. F).  He also observed a red Plymouth sitting in the middle of Chestnut Road with both doors open.  (Id.)  Mr. Samples stated the red car then pulled into a driveway below Smiley Drive.   (Id.)   Mr. Samples told the police that he remembered thinking it might just be a couple arguing.  (Id.)   He further stated that he did not know Leigh Ann Holley, other than to have seen her when she brought her car in for repairs, and he could not be sure whether the woman he saw was or was not Leigh Ann. (Id.)

Mr. Samples also gave a statement to the FBI in which he stated that, at approximately 9:00 p.m. on April 3, 1997, he had seen an altercation between a young woman and an unknown person driving a 1989-1990 red Chrysler Sundance or Shadow.  (# 1, Ex. B to Ex. F).  Mr. Samples stated that the woman "appeared to be

---

[7]  The time indicated in the police report is "9:30 a.m."  The undersigned believes this to be a typographical error.

70

either cold or scared" and that, after she got out of the car, "the driver closed the passenger door and pulled the automobile into an adjacent driveway.  At this time, the woman ran north on Chestnut and disappeared."  (<u>Id.</u>)  Mr. Samples stated that he had known Petitioner for several years, and Leigh Ann for approximately eight years, and further stated that the woman he saw on Chestnut Road "did not appear to be Leigh Ann."  (<u>Id.</u>)

The police also took a statement from a woman named Jennifer Gavitt Donahue on May 30, 1997.  (# 1, Ex. C to Ex. F).  Ms. Donahue stated that, on the evening of April 3, 1997, she was at her home near the intersection of Chestnut Road and Smiley Drive.  Around 9:00 p.m., she saw a red Dodge Sundance or Spirit stop in the middle of the road outside her house.  (<u>Id.</u> at 2).  She observed a couple sitting in the car and stated that "the guy was cursing he was angry, the girl never said anything."  (<u>Id.</u>)  She stated that the guy got out of the car, and threw his shoe into her yard.  The woman then got out of the car and ran behind the car toward a nearby church (toward Margy Drive).  (<u>Id.</u> at 2-3).  Ms. Donahue stated that she did not recognize the man, and her description of him did not match that of Petitioner.  (<u>Id.</u> at 3, 6).  Ms. Donahue, who knew Leigh Ann Holley, stated that she could not say whether or not the woman was Leigh Ann.  (<u>Id.</u> at 3-5).

On May 15, 1997, the FBI took a statement from a James Donahue, Jennifer Gavitt Donahue's father-in-law, who stated that

he heard tires squealing outside his house at or after 9:00 p.m. on April 3, 1997, and that, a few days later, Ms. Donahue had told him about what she had witnessed with the red car. (# 1, Ex. D to Ex. F). Mr. Donahue further stated that Ms. Donahue had told him that she saw the car turn "in the direction of the female and attempted to follow her. Gavitt [Ms. Donahue] continued to hear and occasionally see the automobile circling the subdivision, apparently seeking to find the female. After approximately 20 minutes, the automobile vanished from the area." (Id.)

Petitioner's family hired a private investigator, Michael Mounts, to assist in the preparation of Petitioner's defense. During his investigation, Mr. Mounts received information concerning the alleged murder of a white female by some drug dealers, who allegedly put the body in a tool box, and put it in the Kanawha River in the area of St. Albans, West Virginia.

Mr. Mounts' investigation notes reveal such statements as "K.W.'s car had T-topped red Cavalier[8], had car in April 97," "Beans said 'Woman was chopped up,'" and "Beans (John) saw body - said she was killed at Miracle Acres and kept her for 1 week/they put her body in box and put in river." (# 1, Exs. F and G to Ex. F). Petitioner contends that the failure of his counsel to introduce this evidence at trial deprived the jury of this evidence

---

[8] These notes also contain a notation that K.W. (Kim Walker) had a red t-topped Camaro.

and denied him his right to effective assistance of counsel.   (# 1 at 15-20).

Respondent's Motion for Summary Judgment states:

Petitioner alleges that, given the circumstantial nature of the case against him, counsel was *per se* ineffective for failing to introduce the "red car" evidence.  Even if, as Petitioner alleges, the State's evidence of guilt was wholly circumstantial, the "red car" evidence was equally circumstantial.

* * *

None of the "red car" evidence constituted direct evidence of innocence.  None conclusively identified the young woman seen leaving the red car as Ms. Holley, the descriptions of the woman were vague, none of the witnesses could identify the driver of the red car, and each stated that they had observed this "red car" in Petitioner's neighborhood between 9:00 and 9:30 p.m.

At trial, the State established that Ms. Holley was at her home in Cross Lanes speaking by telephone with her friend Lisa Wiles at 9:35 p.m. (Tr. at 716, 897, 1092-93).  Petitioner's mother testified that the victim dropped her children with their grandmother at 10:00 p.m. (Tr. at 1860).

(# 8 at 18-19).  The Motion for Summary Judgment further states that "[a]t Petitioner's omnibus hearing both defense attorneys testified that they had run down the leads contained in [Mr. Mount's] notes and found them to be without merit."  (Id. at 19).

Petitioner's Response to the Motion for Summary Judgment states:

The evidence adduced at the omnibus hearing overwhelmingly indicated the likelihood that the victim was killed by someone other than the petitioner. Numerous eyewitness statements taken by reputable law enforcement agencies have the victim being assaulted by a man clearly not the petitioner at approximately the

73

precise date and time the victim was last seen. Coupled
with the investigation notes introduced into evidence at
the omnibus hearing, petitioner contends he has presented
clear and convincing evidence of both a constitutionally
ineffective trial strategy under <u>Strickland</u> and clear and
convincing evidence that the Circuit Court's findings
were unreasonable.

(# 13 at 6).

At the omnibus habeas corpus hearing conducted on October 4,
2002, both of Petitioner's trial attorneys were questioned
extensively concerning their decisions on these issues. Mr.
Mitchell testified in pertinent part as follows:

> Q. What, if anything, did you do with that evidence to
> prepare for and/or use at trial in the defense of
> Mr. Holley?
>
> A. I recall that very early on in the defense of Mr.
> Holley, in preparing for his trial, and as you know
> there was as long as two years, it was very
> vigorously investigated, and for whatever reason,
> at the time of the trial it was decided that it
> would do more to confuse the jury then to lend
> weight, help our client under the circumstances
> where the case was going.
>
> Q. Who made that decision at trial?
>
> A. Mr. Murray and myself.
>
> Q. And could you explain to me why, if you had a
> disappearance of a woman who subsequently got
> murdered, allegedly from the home or vicinity of
> Mr. Holley's house, that if you have evidence from
> both the FBI and West Virginia authorities that a
> woman matching her description apparently was
> witnessed to have been abducted or kidnapped within
> a half a block in or about the same time, that you
> would not use that at trial?
>
> A. You would have to ask Mr. Murray that.

(# 1, Ex. G at 37-38). Concerning the information contained in Mr.

74

Mounts' notes, the following colloquy occurred with Mr. Mitchell:

Q. This would appear, from a lawyer who was not there, to be notes in your file suggesting there was one or more witnesses who had information about the death of Leigh Ann Holley that would appear to be inconsistent with the State's theory in the case. Is that a fair summarization of what I'm seeing there.

A. No, it isn't. I see how maybe you came to that conclusion, and Mr. Mounts would have to explain it, but I do recall that early on we were chasing down lots of leads that didn't pan out. I'm guessing that these were some notes of what he was hoping to find or was seeking out or inconsistent with.

I do recall that there was some investigation in this area that didn't pan out. He would have to give you the details as he recalls them. There was a lot of wild goose chases in this case.

\* \* \*

I believe Mr. Mounts' notes did not -- as I recall these did not reflect the death of Ms. Holley, but the death of -- the alleged death of another individual.

\* \* \*

I do know that we looked at that very long and very carefully and it was decided that it wasn't in the best interest to put forth that information during the trial.

(# 1, Ex. G at 42-43, 46-47).

Mr. Murray testified as follows:

A. Prior to trial, I took it upon myself to talk to some of the individuals who were named in these statements. And I talked to them about what they had seen, where they had seen it, what they recall, what they didn't recall, this and that and the other. The information that I got from the witnesses in talking to them was sort of across the

75

> board.
>
> Given the information that I had from them,
> particularly relating to the description and as to
> the time, it was decided that this is probably,
> while it would help to muddy the waters somewhat as
> to what was going on, it might be something that
> would make us look as if we were grasping at
> anything and that we would probably be better off
> to not raise this as a part of our defense.
>
> We were unable to establish what we felt, to a
> reasonable degree, that this had anything to do
> with this case, and that we would therefore -- that
> we were better off just to stick to the issues at
> hand.

(# 1, Ex. G at 92-93).

Mr. Murray further testified that he recalled that the time

frame in which the "red car" incident took place did not line up

with the evidence that Leigh Ann dropped off the children at

Petitioner's parents' house around 10:00 p.m. (<u>Id.</u> at 94-95). He

further testified that Mr. Mounts had told him that the man who

allegedly saw the body of the dead woman at Miracle Acres denied

the entire incident. (<u>Id.</u> at 102-103). No testimony was offered

by the investigator, Mr. Mounts, and Petitioner offered no evidence

whatsoever to rebut the testimony of his counsel that the decision

not to pursue a defense based upon this evidence was a matter of

strategy following extensive investigation.

Following the omnibus hearing, Judge Bloom made the following

findings of fact:

> Both defense attorneys testified that this incident was
> thoroughly investigated. In particular, Attorney Murray
> conducted interviews to try to ascertain whether the

76

reported incident might be helpful to the defense.

For a variety of reasons, it was decided that it would not be helpful to the defense to introduce evidence relating to the red car incident. Although he did not recall the specific times involved, Attorney Murray had a clear recollection that the timing of the red car incident was not helpful to the defense because it occurred prior to the last time that Petitioner told police that he had seen Leigh Ann Holley on the night she disappeared. Trial counsels' testimony on the issue was unrebutted.

\* \* \*

Given that the red car incident did not tend to exculpate Petitioner, the defense team decided not to interject the incident into the trial during the defense case-in-chief. They were concerned that presenting such evidence would seem desperate to the jury, as if the defense were grasping at straws. However, defense counsel did vigorously explore the incident during cross examination of one of the investigating officers.

Based upon investigative notes in the defense file, Petitioner also asserted that the defense counsel failed to fully investigate other leads that might have proven helpful to his case. However, Attorney Mitchell refuted this argument by explaining that the investigator hired by the Holley family had investigated similar crimes that had been committed in this area in hopes that whoever perpetrated one of those crimes might also have been responsible for killing Leigh Ann Holley. These efforts were unsuccessful.

(# 1, Ex. H at 6).

The State habeas court's conclusions of law on this issue were

as follows:

The incident involving the young woman and the red car was thoroughly investigated by Petitioner's counsel.

Petitioner did not introduce any evidence to suggest that the outcome of his trial would have been different had his defense counsel introduced evidence relating to the

77

young woman and the red car.

Based on the timeline established by Petitioner's statements to the police, the red car incident was not helpful to the defense. Further, in light of its lack of evidentiary value, trial counsel had legitimate concerns about how testimony regarding the red car incident would be perceived by the jury.

The failure to introduce evidence regarding the young woman and the red car must be considered a matter of trial strategy.

Trial counsels' decision not to introduce evidence relating to an incident that did not comport with the known facts of the case, and thus was not helpful to the defense, was well within the bounds of competent legal representation.

The decision not to introduce such evidence does not constitute ineffective assistance of counsel.

(Id. at 15-16).

In Strickland, the Supreme Court opined that:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

In the instant case, it appears that counsel conducted a thorough and reasonable investigation under the circumstances, and that the decisions not to present the "red car" evidence or

78

evidence concerning the alleged murder of a woman by area drug dealers as part of Petitioner's defense at trial were matters of strategy that cannot be challenged.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel was ineffective in failing to introduce this evidence at trial.   The undersigned further proposes that the presiding District Judge **FIND** that the State court decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Federal law; nor were the decisions based upon an unreasonable determination of the facts as presented.

### 2.   Failure to object to prosecutor's conduct

The undersigned has previously proposed that the presiding District Judge find that Petitioner's due process rights were not violated due to alleged misconduct throughout the trial by the prosecuting attorney.   Petitioner also raises this issue in a claim of ineffective assistance of counsel for the failure of his trial counsel to object to, or to move for a mistrial as a result of, or ask for a curative instruction concerning, the alleged misconduct.  (# 1 at 20-25).   It is well-settled that "there can be no claim of ineffective assistance of counsel where, as here, counsel is alleged to have failed to raise a meritless argument."   Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996).

Notwithstanding the proposed finding that Petitioner cannot

show a due process violation concerning prosecutorial misconduct, the undersigned notes that the State habeas court made the following findings concerning Petitioner's claim of ineffective assistance of counsel on this basis:

> Attorney Mitchell testified to his opinion that Prosecuting Attorney Forbes' conduct was so outrageous that it went beyond the normal scope of prosecutorial misconduct. However, he and Attorney Murray were in agreement that Prosecuting Attorney Forbes' actions were actually hurting the State's case. This testimony stands without rebuttal in the record.

* * *

> During cross-examination at the October 4 hearing, Attorney Mitchell affirmed that he had discussed the matter with his client and that Petitioner understood the defense strategy of allowing Prosecuting Attorney Forbes' derogatory remarks to go by without objection. This testimony was unrebutted.

> Attorney Murray testified that Prosecuting Attorney Forbes may have overstepped the bounds of propriety during his closing argument. Nonetheless, Attorney Murray reaffirmed his belief that Prosecuting Attorney Forbes' antics were harmful to the State's case. In addition, he believed that there are times in trial when stating an objection gives the jury the impression that the defense is "scared" of something that really is of no moment. Therefore, no objection was made, no mistrial was requested, and no cautionary instruction was sought.

(# 1, Ex. H at 5).

Based upon these findings, the State habeas court made conclusions of law as follows:

> Two very experienced criminal defense attorneys represented Petitioner in the underlying trial. Both were in agreement that the conduct and comments of Prosecuting Attorney Forbes were damaging to the State's case.

80

It is quite possible that a prosecutor who behaves boorishly will alienate a jury. Prosecuting Attorney Forbes' behavior certainly provided a platform from which Petitioner's trial counsel could argue that the State was attempting to bolster a thin, circumstantial case by engaging in unwarranted personal attacks on one of Petitioner's lawyers.

Petitioner did not present any evidence to suggest that there would have been a different outcome at his criminal trial if defense counsel had objected, asked for a mistrial, or sought a cautionary instruction.

The actions of his defense attorneys, of which Petitioner now complains, were based upon strategy decisions. Whether other choices by trial counsel may have had a different result is unknowable. Nonetheless, the actions at issue herein were well within the bounds of competent legal representation and do not constitute ineffective assistance of counsel merely because Petitioner's trial did not yield the outcome he desired.

Further, the unrebutted testimony of Attorney Mitchell established that Petitioner concurred in his counsels' strategy decisions during trial.

* * *

In light of the traditional deference accorded decisions relating to trial strategy, this Court is unable to conclude that the representation afforded Petitioner at his criminal trial was deficient under an objective standard of reasonableness. Nor can the Court conclude that there is a reasonable probability that the outcome of the trial would have been different if trial counsel had objected to Prosecuting Attorney Forbes' actions and statements, requested a mistrial, or asked for a limiting instruction.

(Id. at 14-15).

Based upon a review of the entire record, the undersigned concurs that Petitioner was not denied effective assistance of counsel with respect to the failure of his attorneys to object to Prosecuting Attorney Forbes' conduct. Thus, the undersigned

81

proposes that the presiding District Judge **FIND** that Petitioner has not shown that his counsel was constitutionally ineffective by failing to object to, or move for a mistrial as a result of, or ask for a cautionary instruction concerning the alleged prosecutorial misconduct.   The undersigned further proposes that the presiding District Judge **FIND** that the State court decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Federal law; nor were the decisions based upon an unreasonable determination of the facts as presented.

### 3.   Failure to object to State's voir dire or to conduct reasonable voir dire

In Ground A(3) of his Federal petition, Petitioner asserts:

> During the course of the voir dire examination, the prosecuting attorney improperly provided prospective jurors with definitions of circumstantial evidence, direct evidence and/or reasonable doubt.  See TT 28-29, 29-30, 61-62, 143-145, 173-175, 185-187, 268-271, 339-342, 346-349, 370 and 416-418.  Mr. Mitchell failed to properly object to the prosecution's excessive and improper voir dire tactics nor did he ever ask for curative instructions from the Court as to the proper definitions of such terms.

(# 1 at 25).  Petitioner further argues that his counsel did not have any "recognizable strategy with respect to either jury selection and/or identification of the jurors who may not be able to serve as a matter of law."  (Id.)[9]

---

[9]   As an example, Petitioner asserts that there were members of his jury panel who had sat on a jury and returned a verdict within the prior two years, in violation of West Virginia law.

In his Motion for Summary Judgment, Respondent relies on the findings of fact by the State habeas court, and contends that Petitioner has failed to show why such findings are incorrect or how Petitioner suffered any prejudice.  (# 8, at 44-46).

At the omnibus hearing, Mr. Murray was asked about the defense counsel's strategy for conducting voir dire.  Mr. Murray's response was as follows:

> A.   How much time do we have?  We obviously were trying to get people who were not overly familiar with this case or who were in any way prejudiced in this case by media events and coverage, people -- or try to determine who may have known the Holley family in either a good or a bad light, anybody who was familiar with the victim, the victim's family.
>
> We also had issues of domestic abuse that were of consideration to us.  We wanted to know what the prospective jurors knew about and thought about those sorts of issues.  You had issues of -- do you have family members that have ever been victims of crime, have you been victims of crime, have you been victims of domestic abuse, have you ever been arrested, do you have any brothers or sisters, fathers, mothers that are police officers; a very wide array of information that was of consideration to us.

(# 1, Ex. G at 89-90).  Mr. Murray stated that he did not recall that the defense had any particular strategy for not objecting to the State's voir dire tactics.  (Id. at 90).

The State habeas court's findings of fact on this issue were:

Petitioner asserts that his counsel's voir dire strategy did not take this prohibition into account.  Matters of State law are not cognizable in Federal habeas review, and Petitioner has not demonstrated that his jury panel was biased or unfair.  Thus, Petitioner is not entitled to habeas relief on this claim.

> Petitioner complains that Attorney Mitchell did not have a "recognizable strategy" with respect to jury selection. According to his testimony at the October 4 hearing, jury selection was within the scope of Attorney Murray's responsibilities during Petitioner's trial.
>
> Even after a lengthy lapse of time between trial and the October 4 hearing in this action, Attorney Murray was able to articulate a number of pertinent criteria relied upon by defense counsel during jury selection in Petitioner's criminal trial.

(# 1, Ex. H at 7).

The State habeas court made the following conclusions of law on the voir dire issue:

> The criteria for jury selection enunciated by Attorney Murray during his testimony at the October 4 hearing were pertinent and appropriate to a criminal trial of this nature.
>
> In employing the criteria identified by Attorney Murray, Petitioner's trial counsel's conduct fell within the bounds of competent legal representation.

(# 1, Ex. H at 17).

The undersigned notes that the jury pool in this matter was asked to complete a juror questionnaire which is not a part of the record before this court. Accordingly, the court does not have the benefit of knowing what questions were asked on the questionnaire. Both counsel for the State and Petitioner were permitted to conduct individual voir dire to follow up on the responses given in the questionnaire, and it is the individual voir dire that is on the record.

Nevertheless, Petitioner has not demonstrated by clear and convincing evidence that the factual findings made by the State

84

habeas court were erroneous or unreasonable.

Based upon the foregoing and a review of the entire trial transcript, the undersigned proposes that the presiding District Judge **FIND** that the defense's voir dire tactics fell within the bounds of competent legal representation, and that Petitioner has demonstrated no prejudice as a result of those tactics.   The undersigned further proposes that the presiding District Judge **FIND** that the State court decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Federal law; nor were the decisions based upon an unreasonable determination of the facts as presented.

### 4.   Failure to object to character evidence

Petitioner also claims that his counsel was ineffective in failing to object to the admission of "improper" character evidence.   (# 1 at 26).   Specifically, Petitioner states:

> [T]he State of West Virginia introduced a plethora of character evidence against the petitioner in an effort to apparently show the petitioner was either of bad character and/or had some motive to kill the victim in this case.   A careful review of the transcript in this matter shows the failure of Mr. Mitchell, in most if not all instances, to make timely objections to the admission of the improper character evidence.   There does not appear to be any reasonable explanation which would support a strategy of failing to object to improper character evidence in a murder trial of this nature.

(Id.)

Respondent contends that, pursuant to Rule 404(b), the State properly notified defense counsel of its intent to use certain

"character" evidence at trial, and that defense counsel filed written objections to the introduction of that evidence.   (# 8 at 15; # 9, Exs. 5-8).  Additionally, in a telephonic hearing on April 23, 1999, the trial court granted in part and denied in part the defendant's motion to exclude this evidence.   (Id.; # 9, Ex. 9). Respondent further asserts that "[n]otwithstanding the introduction of this evidence, defense counsel preserved its objections to the introduction of this evidence before the trial court." (Id.)(citing to # 8, Ex. 11 at 473).  Finally, Respondent states that "[d]efense counsel also vigorously cross-examined each of the State's witnesses and successfully moved for a limiting instruction prior to the introduction of any of their testimony." (Id.)(citing to # 8, Ex. 11 at 605).  Accordingly, Respondent asserts that "Petitioner's claim that defense counsel sat by silently while the State destroyed his character is a distortion of the record." (Id.)

On this issue, the State habeas court made detailed findings of fact, which are set forth at pages 53-54, above, and as follows:

> Petitioner claims the prosecution introduced evidence to
> establish that Petitioner had a bad character.   Such
> evidence included, without limitation, stalking his
> estranged wife, calling her on the telephone and cursing
> at her, vandalizing her car, mouthing the words, "I will
> kill you" at her, threatening to kill her if he found her
> with another man, and asking an acquaintance at work if
> he could help Petitioner obtain an unregistered gun.

(# 1, Ex. H at 9).  The State habeas court made conclusions of law,
which are set forth at page 54, above, including the following:

86

The Court does not conclude that the evidence to which Petitioner now objects was improperly admitted. The trial court conducted the appropriate analysis and determined its admissibility. * * *

Although circumstantial, the evidence supporting Petitioner's conviction would render the introduction of the hearsay and character evidence harmless beyond a reasonable doubt, in any event.

(Id. at 18).

A review of the record indicates that Petitioner's counsel objected in writing to the admission of the "character" evidence prior to trial and preserved those objections at trial. (# 9, Exs. 5-8; #9, Ex. 11 at 473-474). The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the conduct of his counsel was deficient under an objective standard of reasonableness under the circumstances. Thus, Petitioner cannot succeed with his claim of ineffective assistance of counsel on this basis. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the State courts' decisions denying Petitioner relief on this claim of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of clearly established Federal Law; nor were the decisions rendered based upon an unreasonable determination of the facts as presented.

## C. DENIAL OF DIRECT APPEAL.

In Ground C of his Federal petition, Petitioner claims that the SCAWV's refusal of his petition for appeal of his conviction

and sentence violated his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.   (# 1 at 37-39). Petitioner acknowledges that there is no specific language in the West Virginia Constitution mandating a right to an appeal in a criminal case, and he further concedes that the Supreme Court has not held that the Fourteenth Amendment requires one mandatory appeal in a case involving a life sentence. (# 1 at 38).  However, Petitioner states, "the right should exist and it does flow from the West Virginia statute, a fair reading of federal due process clause, and constitutional principles of statutory construction are applicable in this matter." (Id.) Petitioner further states that "[f]rom a review of the rulings and procedures of other American states on this issue, it would appear that only New Hampshire, Virginia and West Virginia fail to provide their citizens with a mandatory appellate review of a criminal conviction, although Virginia does make an appellate review mandatory in death penalty cases." (Id. at 38-39).

Respondent contends that Petitioner's claim concerning the refusal of his petition for appeal is not cognizable in Federal habeas corpus.  "Nowhere does 28 U.S.C. § 2254 direct that the federal courts sitting in habeas, second guess a state appellate court's discretionary review." (# 8 at 65).

Petitioner's Response to the Motion for Summary Judgment states in pertinent part:

88

> Given that no state violations will be examined in a
> federal habeas, a West Virginia citizen can be the victim
> of errors of state law with no redress, to the point
> where those citizens can be deprived of liberty for the
> rest of their lives with no recourse of appeal.
> Petitioner argues federal due process reaches this issue
> and mandates as a part of federal due process all state
> citizens be afforded at least one direct appeal to one
> post-conviction court of record as a minimum due process
> requirement.

(# 13 at 15). However, the Response further states that Petitioner "concedes that he has no citations in support of his position and that such an extension of federal due process would in all likelihood need to emanate from the United States Supreme Court." (Id.) It appears that the Response abandons a claim of denial of equal protection, as only due process is mentioned. (Id., at 14-15.)

As noted by both parties, section 2254 requires a Federal court to review a prisoner's habeas corpus claims in light of "clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254((d)(1). The Supreme Court has not mandated that a State guarantee one direct appeal from a conviction for a serious felony. Moreover, a Federal habeas court may not create new rules of law. Teague v. Lane, 489 U.S. at 310. For these reasons, this Federal court cannot grant Petitioner the relief that he seeks.

The State habeas court made two conclusions of law on this issue:

> The Supreme Court of Appeals of West Virginia has

> heretofore ruled that the discretionary appellate review available to a criminal defendant in West Virginia comports with the constitutional requirements of due process. *Billotti v. Dodrill*, 394 S.E.2d 32, 40 (1990).
>
> Under the current state of the law in West Virginia, Petitioner cannot prevail upon his claim of entitlement to full appellate review as a matter of right.

(# 1, Ex. H, at 17).

The *Billotti* case cited by the State habeas court resulted in a similar holding in the context of Federal habeas corpus. In Billotti v. Legursky, 975 F.2d 113, 115 (4th Cir. 1992), cert. denied, 407 U.S. 984 (1993), the Fourth Circuit held that the procedural protections provided to defendants seeking a direct appeal "mirror the requirements that the United States Supreme Court has held to be mandatory when a state grants appeal as of right."

> The Fourteenth Amendment does not authorize the federal courts to micromanage state criminal justice systems. [Citation omitted.] In our federal system, the states are allowed to structure their systems of criminal justice as they see fit, as long as their systems satisfy the basic demands of due process. * * * West Virginia allowed Billotti to communicate his claims of legal error to the reviewing tribunal, accompanied by a record of the proceedings below necessary to evaluate his arguments. We believe that due process requires no more.

975 F.2d at 116-17.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim that the refusal of his petition for appeal violated his right to due process of law lacks merit. The undersigned further proposes that the presiding

90

District Judge **FIND** that the State court decisions denying Petitioner relief on this claim were neither contrary to, nor an unreasonable application of clearly established Federal law.

### D.   INSTRUCTIONAL ERROR.

In the very last paragraph of Petitioner's Federal petition, he states, "Petitioner also preserves his right to claim a due process violation for the failure to submit correct jury instructions to the extent such claim is not covered under petitioner's ineffective assistance of counsel claim."   (# 1 at 39).   Based upon the undersigned's review of the petition, this issue is not discussed anywhere else therein, or in Petitioner's reply brief.   Respondent did not address this issue in his Motion for Summary Judgment.

Generally speaking, allegations concerning instructional error are not cognizable on federal habeas review, because they raise issues of state law, not federal constitutional law.

> It is black letter law that a federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(West Supp. 1998); see also Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991) (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.").   Because Wright's claim, when pared down to its core, rests solely upon an interpretation of [State] case law and statutes, it is simply not cognizable on federal habeas review. See Smith v. Moore, 137 F.3d 808, 822 (4th Cir. 1998)(refusing to entertain claim that jury

instruction misstated South Carolina law).

<u>Wright v. Angelone</u>, 151 F.3d 151, 157 (4th Cir. 1998).

Petitioner has not identified any specific alleged instructional error, or any specific instructions he claims his counsel failed to offer. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a denial of his right to a fair trial, or a denial of his right to effective assistance of counsel, due to the absence of any particular jury instructions.

### RECOMMENDATION

For the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot succeed on any of the claims contained in his Federal habeas corpus petition and, thus, Respondent is entitled to judgment as a matter of law on each of Petitioner's claims. It is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment and dismiss Petitioner's section 2254 petition with prejudice.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and

then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

Dec. 30, 2004
Date

Mary E. Stanley
Mary E. Stanley
United States Magistrate Judge

93